UNITED STATES of America ex rel.
Leroy VANDERHORST, Relator,

v.

Hon. J. Edwin LaVALLEE, as Warden of
Auburn State Prison, Auburn, New
York, Respondent.

No. 68 Civ. 558.

United States District Court
S. D. New York.

April 25, 1968.

Anthony F. Marra, New York City, for relator; William E. Hellerstein, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of State of New York, New York City, for respondent; Joel Lewittes, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

On the night of April 15, 1964, Harold Johnson, Jr., was shot in the back of the head and killed. Some 24 hours later the petitioner was charged with the slaying. Indicted for first-degree murder, he was found guilty by a jury of murder in the second degree, and sentenced to prison for the mandatory minimum term of 20 years to life. The conviction was affirmed by the New York Appellate Division, First Department, on March 7, 1967 (People v. Vanderhorst, 27 A.D.2d 904, 280 N.Y.S.2d 532), and leave to appeal to the Court of Appeals was denied on May 11, 1967. With the Chief Justice and Mr. Justice Black dissenting, the Supreme Court denied certiorari on January 15, 1968, 389 U.S. 1058, 88 S.Ct. 795, 19 L.Ed.2d 858. Petitioner's application for habeas corpus renews in this court a contention urged in his unsuccessful appeals: that extensive confessions to the police and an assistant district attorney, critically important in the evidence for conviction, were unconstitutionally extracted from him and should therefore have been excluded by the trial court. Though the claim has thus far evoked no written opinion, it is plainly a substantial one.

## I.

Both petitioner and respondent are agreed that the state trial record is adequate to pose the constitutional problem, so that there is no occasion for an evidentiary hearing in this court. After close study of that record, the court joins in this initial premise of the parties. Focusing upon the aspects of present concern, the relevant circumstances may be summarized as follows:

Because it was clear in advance that petitioner's incriminating admissions were to play a part (and, as it developed, a key part) in the prosecution's case, the trial court conducted a pre-trial *"Huntley"* hearing as required by People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), pursuant to the ruling in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Three New York City detectives were called by petitioner to testify in this hearing. Omitting here some small discrepancies, these witnesses recounted that at about 10 p. m. on April 16, 1964, the day after the shooting, two of them went, with an officer of the private guard agency which employed petitioner (and had employed the deceased), to a supermarket in Brooklyn where petitioner was stationed at the time. They "asked" petitioner to accompany them back to the station house, and he consented. Following their arrival at the precinct at about 11 p. m., they said, they proceeded to question petitioner. By about 11:30 p. m., after some initial denials, petitioner admitted that he had fired the fatal shot, from the gun of the deceased. According to the police officers, his narrative to them described the tragedy as an accident, resulting from his effort, at Johnson's suggestion, to insert cartridges of too large a calibre into the weapon. These admissions also told, however, that petitioner, after the shooting, had taken $90 from the dead man's pocket, and then fled to the home of a girlfriend where he was later shown to have made further admissions of the shooting.

At around 12:30 a. m. on April 17, after the foregoing statements to the

police, petitioner went with two of the detectives to his apartment, where he took from a dresser drawer and gave them what was later to be identified (and what the police said petitioner acknowledged) as the murder weapon. He was then brought back to the police station and questioned some more. After repeating and amplifying his earlier admissions, he was booked and (at about 1:30 a. m.) placed in a cell until 3 a. m., when an assistant district attorney arrived to question him. The stenographically recorded transcript of that interrogation is at the heart of the problem in this proceeding.

Neither the police nor the assistant district attorney advised petitioner of his right to remain silent or of his right to consult a lawyer. The detectives denied, however, that (as petitioner later asserted on the trial) he had asked for counsel or that he was beaten or otherwise coerced into making what amounted ultimately to a substantially full confession.

In the face of the police testimony, and without putting petitioner on the stand in the *Huntley* hearing, defense counsel urged that the admissions to the police and the assistant district attorney should be excluded (1) as the involuntary products of beatings, (2) because petitioner had asked in vain to see a lawyer, and (3) because he had not been advised of his constitutional rights. The trial judge rejected these contentions (Tr. 87–91).[1] He found on the evidence then before him that petitioner had incriminated himself voluntarily; that he had not been beaten or otherwise forced to confess; that no promises or threats had been made (Tr. 90). He also found that petitioner had been neither advised nor misled as to his constitutional rights (Tr. 90):

" * * * The defendant was not informed that he had a right to counsel or that he had a right not to answer questions. Neither was he informed to the contrary."

Upon these preliminary findings of voluntariness, the trial judge concluded (Tr. 91) that, "assuming that a proper foundation is laid for such statements on the trial, they will be admissible."

When he announced this pre-trial ruling, the judge had before him only a partial account of the contents of the admissions in question. Concerned, as trial judges are in such situations, with the factors that might affect voluntariness or other constitutional criteria of admissibility, he had no apparent occasion to hear in detail the substance of the allegedly incriminating conversations. Thus, he heard somewhat sketchily what were later amplified at the trial as petitioner's admissions to the detectives. However—and this is a matter of importance for present purposes—there was no account in the pre-trial hearing of what was contained in the question-and-answer transcript of the interrogation by the assistant district attorney beginning at about 3 a. m. on April 17, 1964 (see Tr. 90). It was not until the trial that either defense counsel or the judge saw or heard that transcript. Toward the end of the fifth trial day it was read into evidence by the stenographer who had taken and transcribed it. And it is that point which presents, in a few lines, the central and troublesome difficulty which was at the core of petitioner's appeals and is similarly pressed here as fatal to his conviction.

The transcript, covering about 15 pages of the trial record, consisted of some 138 questions and answers. The nub of our concern appears at the outset, in the third and fourth of the questions and answers. To set the immediate context and quote from the beginning of the questioning, emphasizing the crucial lines, the initial five questions and answers read as follows (Tr. 459):

"Q * * * I am an assistant district attorney. I am going to ask you some

---

1. This and similar references are to the state trial transcript.

questions and I assume that your answers will be truthful. Is that correct?

"A Yes, sir.

"Q And that your answers will be voluntary and truthful.

"A Yes.

"Q *Your answers will be voluntary and truthful?*

"A *Voluntary. That means what?*

"Q *That means anything I ask you, if I ask you a question, you will answer the question.*

"A *Yes.*

"Q And you will answer the questions truthfully; is that right?

"A Yes."

Before sketching the rest of the trial setting in its pertinent aspects, some points related immediately to the quoted passage may be noted here:

(1) Defense counsel made no special and particularized argument at any time in the trial directed to the transcript lines italicized in the foregoing quotation. His contentions before, during, and after the trial—addressed to the oral admissions to the detectives as well as the transcribed confession—related to alleged involuntariness generally and failure to advise the accused of his rights. The only additional argument directed at the transcript during the trial was that it recorded questions and answers made after petitioner had been formally booked, a factor urged by defense counsel as strengthening his case under Escobedo v. [State of] Illinois, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] (1964). Adhering to his prior ruling, the trial judge observed again that while petitioner had not been given the advice since required by Miranda v. [State of] Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), "Neither was he informed to the contrary." (Tr. 549).

(2) The assistant district attorney's strange definition of "voluntary" did become petitioner's main point on appeal. Since the Appellate Division affirmed without opinion, the Court of Appeals refused leave to appeal, and the Supreme Court denied certiorari, there is no way of knowing whether any of those tribunals found merit in the State's contention (urged throughout and renewed here) that the matter was lost by a deliberate and purposeful waiver.

Returning for now to the fuller trial context, the totality of the evidence was plainly sufficient to sustain petitioner's conviction. The jury could have found, as it evidently did, that petitioner and the deceased were fellow employees of the Veterans Detective Bureau, a company furnishing private uniformed guards for various establishments; that they were social friends as well as co-workers; that both had been paid on the day of the shooting; that petitioner had gone on that evening to visit with Johnson at a cooperative apartment complex where the latter was on duty; that they had spent some time drinking together in a community room of one of the cooperative buildings; that at some point, intentionally though without premeditation and deliberation, petitioner had shot and killed Johnson; and that petitioner had then taken Johnson's money though he had not been embarked on the crime of robbery before the shooting.

While the evidence as a whole would have sustained such findings, petitioner's admissions to the police and the assistant district attorney were, as the trial judge noted (Tr. 928), obviously of major importance in the prosecution's case. And the transcript of the 3 a. m. interrogation was a matter of unique significance. According to the detectives, petitioner's account to them described the shooting as an accident. In the transcribed story extracted by the assistant district attorney, prodded by the questions of a skilled and unopposed lawyer, petitioner went further and was led to admit in substance that he had killed his friend for

his money. The reluctant last steps by which petitioner was thus moved toward the sealing of his own fate are indicated by the extracts in the margin.[2]

2. "Q Now, was anyone else in that room, that community room, other than you and Harold Johnson? A No.

"Q Were the lights on in that room before both of you went in? A He put the light on because we went through the kitchen.

"Q Now, both of you are in the community room. A Yes, sir.

"Q From that point on, please tell me exactly what happened, what you said, what he said, and what happened. Talk slowly. A He—first I asked him, I said, 'What time are you going to leave?' He said, 'As soon as Lieutenant Moore gets there.' He told me, he said, 'Look, Lee, I don't have but five bullets,' he had said, 'in the gun.'

"Q What gun are you referring to? A .32 revolver.

"Q Who had the gun? A Harold Johnson, Jr.

"Q Did he have it on his person? A Yes, he did.

"Q Was it in a holster? A Yes, he did.

"Q And you say he said something to you about the gun and bullets? A Yes.

"Q You said he had what? A Five bullets.

"Q Continue, please. A He took out the gun out of the holster and he handed it to me and said, 'See if the bullets fit, and if the bullets do fit—

"Q What bullets fit? A 38 automatic.

"Q Who had those bullets? A I did.

"Q With you? A I had one in my pocket.

"Q And he asked you whether you had any bullets that would fit it? A He told me he didn't have but five bullets. I said, 'I got some in the house, if they fit. I have one in my pocket.' He said, 'Try it, see if it fit and if that fit we stop by your house before I go to Brooklyn.' And I said, 'Yes.' And he handed me the gun, one chamber, and I pulled one out and tried the .38 automatic. I didn't—and I pulled the trigger and it fired. I found he was dead. I got scared and I ran to this single door and after I got to the door and I said, 'Lord, no, I can't leave him there.'

"Q Let me ask you this. You had the gun in your hand? A Yes.

"Q Where were you when the gun was fired? A I was standing by the water cooler.

"Q And you had the gun in your hand? A Yes.

"Q Where did you point the gun? A Before I got up off the stool Harold was sitting on this side of me.

"Q What side of you? A He was sitting right by me and the gun went off. He was outside by the piano.

"Q Where was Harold when the gun went off? A He was playing the piano.

"Q Where were you? A I was standing by the water cooler.

"Q Where was the gun pointing? A Toward the window.

"Q Was that in the same direction where Harold was, is that right? A. Yes.

"Q Did you hold the gun in your hand? A Yes.

"Q And did you have your finger on the trigger? A Yes, I had, at the same time I raised the gun up.

"Q Did you have your finger on the trigger? A Yes.

"Q And did you pull the trigger? A. I had to pull the trigger.

"Q And in what direction was the gun pointing at at the time you pulled the trigger? A At the time I pulled the trigger it was toward the window and same place Harold was sitting.

"Q You pulled the trigger? A Yes.

"Q And after you pulled the trigger, what happened? A After I pulled the trigger he fell on the piano.

"Q Where did you—Why did you pull the trigger and point the gun at Harold? A Why? I don't know. I know for one thing I was drunk and after—

"Q The point is this. You pulled the trigger—

```
*     *     *     *     *
```

"Q You pointed the gun in the direction of Harold; is that correct? A Toward him and the window.

"Q You pulled the trigger; is that correct? A Yes.

"Q And what happened after you pulled the trigger? A After I pulled the trigger and the gun went off and fired and he fell on the piano and I said, 'Oh, Lord, I shot Johnson.' I picked him up and his eyes were changing color so I ran to the door and I was trying to get the bullets out so the gun fired again.

"Q How did the gun fire again? A I was running and trying to get the bullets out and the gun fired.

"Q In what direction did you have the gun when it fired again? A I had the gun like that.

The ultimate admissions were explicitly and ineradicably fatal to petitioner's defense even though the words, closely read, seem to reflect at vital points a coached "reconstruction" by the pliant prisoner rather than simple "recollection" of the crucial events. (Note, for example, in the extracts just quoted, footnote 2, such statements by petitioner to the questioner as "I had to pull the trigger"; "It had to be in the air"; and, after first denying that robbery had been the reason for the shooting, "That had to be the reason.") It is not surprising that the trial prosecutor found it useful to lace through his summation, and quote at length from, the transcribed fruits of this unequal encounter in the police station (see, e. g., Tr. 845–848, 849–851, 853–856).

After the defense had rested, petitioner took the stand. As to the circumstances bearing upon his alleged confession, he (and his mother thereafter) reported that he was nineteen years old, a graduate of a South Carolina high school, and possessor of an undisputed record of steady employment. Contradicting the police officers, he told that they had come for him at the Brooklyn supermarket (where he had been on duty from about 9 a. m. on the day, April 16, following the shooting), "snatched" him and bundled him into a car, and then beaten him brutally in the station house. Despite this alleged violence, he testified, he had made none of the incriminating statements reported by the detectives and had given none of the answers read by the stenographer as records of his responses to the assistant district attorney.

As to the facts of the alleged crime, petitioner admitted having been with Johnson on the night of the shooting, but otherwise contradicted every material item of the evidence against him. He denied having shot Johnson, swearing he had not known of Johnson's death until the afternoon of the following day when an officer of his employer telephoned and told him about it. He denied having made the damaging admissions to his girlfriend, thus contradicting her testimony and other, substantially corroborative testimony by a number of state witnesses. It is enough for present purposes to add that a considerable array of powerfully detailed testimony (aside from the admissions to the police and the assistant district attorney) was flatly opposed in vital respects to the story petitioner told. It is obvious that the jury disbelieved him, making a judgment that is not open to question on the trial record. The trial judge, who expressed regret that he was powerless to impose less than the minimum sentence required by the jury's verdict, was also of the view that petitioner had committed perjury on the witness stand. In passing sentence, he made these interesting observations (Tr. 962):

"I should add that the reason that I impose this sentence is that this is the minimum sentence required by law, as I understand it. I will add for the record if I had discretion I would impose a lesser sentence in view of the fact that this defendant has no previous record whatsoever and it is my belief that he was drunk at the time of

"Q Up in the air? A It had to be in the air.
"Q Did you fire the gun a single time? A Yes, I did.
"Q Where did the bullet go? A I don't know if it went in the ceiling.
"Q In any event, did you take any money from the pocket of Harold Johnson? A Yes.
"Q How much did you take? A $90 in his pocket.
"Q And was that the reason that you shot Harold Johnson, to get his money?

A No, that is not the reason. I don't know what it is.
"Q Did you tell me that earlier when I asked you was that the reason? A That had to be the reason.
"Q Is that the reason? A That is the reason. That is the reason.
"Q Tell me in your own words, was that the reason you shot Harold Johnson was to get his money, is that correct? A Yes." (Tr. 463–467.)

the act. It is barely possible that if he had not lied his head off on the witness stand he might have been convicted of manslaughter rather than murder. If I had discretion I would impose a sentence which would permit him to be paroled after considerably less time than this, half the time.

"I make this statement on the record for such use as counsel may wish to make of it at any future date, either in connection with application for parole or executive clemency."

The points reflected in these final thoughts of the trial judge are significant in more than one respect, if not in any sense decisive, for the problem confronting this court. For one thing, those remarks tend to underscore the trial court's express judgment that the incriminating statements here in question were possibly crucial factors affecting at least the degree of the crime for which petitioner was convicted. In addition, petitioner's dubious testimony—resulting in the at least superficially irreconcilable assertions that (1) his confessions were involuntary and (2) he didn't confess—supplies a substantial part of the ground on which the State builds its major thesis that the attack upon the police-station transcript was irreversibly "waived" in the trial court. These and other considerations have been weighed by this court in the course of concluding that the writ must be granted, for reasons outlined in the discussion which follows.

## II.

Having agreed with counsel that no evidentiary hearing is required for this habeas proceeding, the court should also make clear what is entailed by that preliminary determination. The hearing conducted by the state trial court in accordance with Jackson v. Denno, supra, appears to have been full and fair so far as it went. The decision of the trial judge, with respect to the things he decided, seems to have been thoughtful, directly and aptly geared to the issues, and fully grounded in the evidence. There is no reason to doubt the propriety of his findings as to the "primary, historical facts," Fay v. Noia, 372 U.S. 391, 422, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and no occasion (as all agree) to duplicate the efforts which underlay them. See Townsend v. Sain, 372 U.S. 293, 312–313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); 28 U.S.C. § 2254(d). Thus, to make explicit where this takes us, this court accepts as established for present purposes that petitioner was not beaten or threatened; that no promises were made to him; that he made no request either to make a telephone call or to consult with counsel; and that he was given no advice as to his right to keep quiet, his right to counsel, or the potential use of his incriminating statements against him.

■ The trial court's conclusion that petitioner was given no misleading advice is another thing again. The response of the assistant district attorney when petitioner asked what "voluntary" meant is an undisputed matter of the record upon which the State has relied. That definition was clearly and grossly wrong. Considering the circumstances in which that response was given, it becomes, as this opinion has already foretold, an indefensible flaw rendering use of the transcript at the trial an offense against petitioner's right to the due process of law.

■ While the "advice" given by the assistant district attorney is, in this court's view, the decisive factor which tips the scales against the State in this proceeding, the balance must, of course, include the "totality of circumstances," Haynes v. State of Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), pertinent to issues of this kind. Accordingly, at the cost of some repetition, it seems useful to summarize here other relevant facts about petitioner and the setting in which he made a record of his guilt for the assistant district attorney. These include:

(1) The relative youth of the petitioner, who appears, despite some contradictions in the record, to have been 19 years old at the time.

(2) The relative ignorance and lack of sophistication of this Negro youth, a recent migrant from the South to a New York City ghetto area, who had no prior conflict with the law and whose possession of a high school diploma from his South Carolina home town could scarcely have equipped him to match wits in the station house with a trained prosecutor.

(3) The place and the time of the confession—some 18 hours after petitioner had gone to work the preceding morning, five hours after he had been "asked" to come to the police station,[3] three or four hours after he had already made damning admissions to three detectives and his employer accompanying them.

(4) The fact that petitioner was alone, and without advice as to his constitutional rights, when the assistant district attorney, flanked by two police officers, told him in effect that "voluntary" means "compulsory."

Visualizing the scene of the transcribed confession, the court is compelled to conclude that the explanation given by the assistant district attorney—that "voluntary" "means anything I ask you, if I ask you a question, you will answer the question"—amounted in effect to a direction, instinct with a threat. As counsel have agreed, there is no way to recreate the event more satisfactorily than the written record gives it to us. But even if it were the law that uncertainties about such happenings in the police station could favor the State rather than petitioner, see Bram v. United States, 168 U. S. 532, 565, 18 S.Ct. 183, 42 L.Ed. 568

(1897); United States v. Mullings, 364 F.2d 173, 175 (2d Cir. 1966), there is no persuasive means by which to analyze away the ominous error in what the assistant district attorney said. Conjuring with the bare words, the court has undertaken to imagine how tone of voice or expression or manner might have conveyed something other than the egregious message of the literal text. None of this helps. Nor is respondent aided by the exegesis of his counsel who urges that the critical question and answer, read with the "prefatory colloquy, * * * indicates no more than that petitioner had manifested a readiness to truthfully respond to the forthcoming questions."[4] The court is unable to follow the reasoning by which respondent concludes that

"Vanderhorst could not possibly have been led to believe that he had no right to remain silent. As a matter of fact, he did not indicate even the slightest interest in knowing whether he possessed such a privilege."[5]

On the contrary, when an unschooled prisoner, charged with murder, asks a prosecutor in the police station what "voluntary" means, it might be supposed that he has evinced an "interest" tied unmistakably to the subject of his constitutional privileges. Any lawyer hearing the question, and remotely concerned with the commands of the Constitution, should have been led almost instinctively to acknowledge the prisoner's right to be silent and refrain from giving evidence for his own conviction. If there can be doubt about that, it surely cannot be questioned that what the assistant dis-

---

3. One detective testified that petitioner was "asked" to come to the precinct from his place of work in Brooklyn and that he was not "in custody" until after he had admitted shooting Johnson (accidentally). Another detective (placing the event around 9 rather than 10 p.m.) said petitioner was taken into "custody" immediately in Brooklyn (Tr. 75), an account more consistent with the undisputed fact that the police promptly searched him there and then. Even on a cold record, there is something naggingly Pick-

wickian about a detective's characterizing as a "request" the inducement which leads a citizen to let himself be searched and carried off to a police station so that he can admit to a murder. Cf. Clewis v. State of Texas, 386 U.S. 707, 711 n. 7, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

4. Supreme Court brief opposing certiorari, p. 26, submitted in opposition to the habeas application here.

5. Id., p. 27.

trict attorney actually said was patently wrong and severely misleading.

It is relevant to recall from contexts far less grave the professional strictures which warn that "[i]t is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law." [6]

If the profession will not sanction the giving of "advice" to an unrepresented spouse as an incident of seeking consent to a divorce,[7] or the mailing of a threatening collection letter to an uncounseled debtor,[8] or "advising" or making inquiries of a prospective defendant in a car dent case in ways that might amount to "a subterfuge to obtain information which would not otherwise be forthcoming," [9] the general prohibition might be thought no less fitting where the lawyer is a public official, flanked by police, confronting an accused delivered up to him from a jail cell after preliminary softening and self-incrimination under police questioning. See Broeder, Wong Sun v. United States: A Study in Faith and Hope, 42 Neb.L.Rev. 483, 509–604 (1963), cited in Escobedo v. State of Illinois, supra, 378 U.S. at 487 n. 7, 84 S.Ct. 1758, 12 L.Ed.2d 977. It would appear that Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), has brought us reasonably close to that position. But even apart from and before that decision, inapplicable here, Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the kind of confrontation petitioner had with the assistant district attorney in the police station has for years been recognized as being fraught with peril to the untutored and unaided accused. See Miranda v. State of Arizona, 384 U.S. 436, 445–458, 86 S.Ct. 1602 (1966); Culombe v. Connecticut, 367 U. S. 568, 575–576, 81 S.Ct. 1860, 6 L.Ed.2d

1037 (1961); Spana v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Leyra v. Denno, 347 U.S. 556, 561, 74 S.Ct. 716, 98 L.Ed. 948 (1954); Haley v. State of Ohio, 332 U.S. 596, 599–600, 68 S.Ct. 302, 92 L.Ed. 224 (1948).

If it be granted, then, that the interrogation was allowable, it was a procedure demanding the utmost sensitivity to the constitutional rights of the defendant in custody. If the prosecutor was free to omit the warnings any lawyer would have deemed vital to petitioner's interests— warnings which, if fully understood, would most probably have prevented the accused from making a neat transcript calculated to lead him to prison, cf. Watts v. State of Indiana, 338 U.S. 49, 59, 69 S.Ct. 1347, 1357, 93 L.Ed. 1801 (1949) (opinion of Jackson, J.)—he was not privileged to substitute misleading and inherently coercive "information."

The principles governing problems of this kind are clear and familiar though it may be hard work to perceive the results they require on the variegated facts of particular cases. As has been noted, the "totality of the relevant circumstances" must be appraised. Culombe v. Connecticut, 367 U.S. 568, 606, 622, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); see also Haynes v. State of Washington, 373 U.S. 503, 513–514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed. 2d 77 (1968). While this case pre-dates *Miranda,* it was scarcely novel doctrine when that decision mentioned that "the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." 384 U.S. at 455, 86 S.Ct. at 1618; and see id. at 456, 457, 458, 461, 465, 467, 86 S.Ct. at 1618, 1620, 1621, 1623, 1624. It is pertinent, therefore, to emphasize that we are concerned here with questioning in the police station. Similarly,

---

6. Canon 9, Canons of Professional Ethics.

7. See American Bar Association, Opinions on Professional Ethics, Formal Opinion 58, p. 302 (1967).

8. See American Bar Association, Committee on Professional Ethics, Informal Decisions, No. 734 (1964).

9. Id., Informal Decision No. 670 (1963).

again apart from *Miranda*, it is "a significant factor" weighing against admissibility of petitioner's confession to the assistant district attorney that he was given no advice whatever of his rights to remain silent and to have a lawyer. Davis v. State of North Carolina, 384 U.S. 737, 741, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Haynes v. State of Washington, supra, 373 U.S. at 516–517, 83 S. Ct. at 1344–1345. The bleak and frightening time of the confession, 3 a. m., and the presumed weariness of the accused after a full day's work and a prior search of his person and course of grilling by the police—these, too, are relevant circumstances. Such factors weigh against the position of the State, as does the relative inexperience and youth of the accused beleaguered in the station house.

■■ But it should be stressed that these attendant circumstances without more would not justify issuance of the writ in this court's judgment. The critical element is the patently wrong advice of the assistant district attorney. Viewed in total context, this blunder was far more serious than the "possibly misleading" statements of a prosecutor held to vitiate a conviction based in part upon resulting "false exculpatory statements" (not a confession) in United States v. Mullings, 364 F.2d 173, 175 (2d Cir. 1966).[10] Cf. Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); People v. Noble, 9 N.Y.2d 571, 216 N.Y.S.2d 79, 175 N.E.2d 451 (1961); Miranda v. State of Arizona, supra, 384

U.S. at 455, 86 S.Ct. at 1617 ("When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice."). This petitioner was never told of his right not to answer in any circumstances. Instead, held captive in a place where far more sophisticated people believe they are compelled to answer on pain of imagined or unknowable consequences,[11] he was told in substance that such a false belief represented the fact for him. His situation, friendless and uncounseled, was at best far removed from the protections professed by our ideals for persons charged with crimes. "The Constitution does not contemplate that prisoners shall be dependent upon government agents for legal counsel and aid, however conscientious and able those agents may be." Von Moltke v. Gillies, supra, 332 U.S. at 725, 68 S.Ct., at 324. But if such advice is given, however partially and reluctantly, it must be accurate as far as it goes. Id. at 728, 730, 68 S.Ct. at 325, 326 (Frankfurter, J., concurring). Or, if there could be a question about that, there can surely be none that the public prosecutor is forbidden to suggest or announce, contrary to the Constitution, a duty to confess in the police station. Whatever sharp differences have been evoked by the decisions in *Escobedo* and *Miranda*, this conclusion would seem to rest upon generally agreed principles.[12]

■ So holding, the court must explain, finally, its grounds for rejecting

---

10. The more limited error of the prosecutor in *Mullings* was his advice to the accused at the outset of an interrogation "that he had a constitutional right not to answer any * * * questions *if he felt that the answers to those questions would in any way incriminate him*." Ibid., emphasis added.

11. "It is probable that even today, when there is much less ignorance about these matters than formerly, there is still a general belief that you must answer all questions put to you by a policeman, or at least that it will be the worse for you if you do not." Devlin, The Criminal Prosecution in England 32 (1958), quot-

ed in Miranda v. State of Arizona, supra, 384 U.S. at 468 n. 37, 86 S.Ct. at 1625. See also Bram v. United States, supra, 168 U.S. at 550, 553, 556–557, 18 S.Ct. at 189, 192.

12. "If an accused is told he must answer and does not know better, it would be very doubtful that the resulting admissions could be used against him. When the accused has not been informed of his rights at all the Court characteristically and properly looks very closely at the surrounding circumstances." Mr. Justice White, dissenting in Escobedo v. State of Illinois, supra, 378 U.S. at 499, 84 S. Ct. at 1769.

respondent's contention that petitioner's claim for relief in habeas should be barred for failure to point out in the state trial court the particular flaw urged here as decisive. As has been mentioned, petitioner's counsel did attack as involuntary and inadmissible all of petitioner's admissions, to the police as well as the prosecutor, but his reliance was upon alleged beatings in the police station and the failure to advise petitioner along the lines later to be required under *Miranda*. No mention was made of the erroneous advice given by the assistant district attorney. In the pre-trial hearing, this factor was unknown. But when it was spread upon the record, no specific objection was made focusing upon the fault here held to be the vital one. Neither at the time when the question-and-answer transcript was read nor at any later point in the trial court was this omission repaired. For this reason, respondent urges, the point was waived. In addition, citing petitioner's evidently false testimony that he made no admissions in any event, respondent argues that the failure to state what is now the major ground for attacking the conviction was a "deliberate choice of * * * strategy", Henry v. State of Mississippi, 379 U.S. 443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), barring the specific federal claim now asserted. These arguments are not devoid of substance, but they have not prevailed.

As to the question of simple "waiver," postponing the subject of "deliberate bypassing," it might be sufficient to observe that such a "default will not alone preclude consideration" of a claim otherwise cognizable in federal habeas proceedings. Henry v. State of Mississippi, supra, 379 U.S. at 452, 85 S.Ct. at 570; Fay v. Noia, supra, 372 U.S. at 399, 426–434, 83 S.Ct. at 827, 842–847, 9 L.Ed.2d 837. A few further observations are in order, however. For one thing, as has been apparent, petitioner's counsel did oppose reception of the confessions, including the one to the district attorney, on grounds closely approaching the one

pressed here. He urged the failure to advise petitioner of his rights; the trial judge, though he seems to have overlooked the severe lapse found fatal in this court, twice showed his explicit awareness that misleading advice was a subject to consider (Tr. 90, 549). Thus, the issue has at least some qualities, if not all, of the category where the new "point" in later proceedings is an additional "argument" rather than a wholly novel objection raised for the first time. Cf. Sanders v. United States, 373 U.S. 1, 16, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Black v. Beto, 382 F.2d 758 (5th Cir. 1967); United States ex rel. Kemp. v. Pate, 359 F.2d 749, 751 (7th Cir. 1966); Kirby v. Warden, Maryland Penitentiary, 296 F.2d 151, 152 (4th Cir. 1961), cert. denied, 368 U.S. 1002, 82 S.Ct. 635, 7 L. Ed.2d 541 (1962); Daugharty v. Gladden, 257 F.2d 750, 758 (9th Cir. 1958).

Furthermore, it is not disputed that the precise objection central to his submissions here was no less paramount in petitioner's state appeal. It is equally unquestionable that the Appellate Division had power to entertain the question on its merits despite the State's insistence that "the precise objection [was] being improperly urged for the first time on appeal."[13] N.Y. Code of Crim. Proc. § 527; People v. McLucas, 15 N.Y. 2d 167, 256 N.Y.S.2d 799, 802, 204 N.E. 2d 846 (1965). Since the Appellate Division affirmed without opinion, there is no way of knowing whether it reached the main question urged upon it. But the resulting uncertainty ought not to be resolved against a man serving 20 years to life upon a conviction obtained in violation of the Federal Constitution. And, more importantly, the *power* of the state court to consider this federal issue, whether it was exercised or not, probably imports a similar authority here. Cf. Williams v. State of Georgia, 349 U.S. 375, 383, 75 S.Ct. 814, 99 L.Ed. 1161 (1955).

We revert, then, to the State's main theory—that petitioner's contention of

---

13. Respondent's Brief in the Appellate Division, p. 21.

primary concern here was "deliberately bypassed" in the state trial court. This theory, to repeat it, is that petitioner's counsel must have chosen purposefully to forgo the point because petitioner's intention to testify that he had admitted nothing would have created a self-defeating "inconsistency" with the argument that he had been misled into confessing involuntarily. This imaginative recreation of a hypothetical strategy is at most ingenious. The supposed inconsistency, if there was one, was already present in the vigorous arguments by petitioner's counsel that the admissions had been coerced by physical torture and were inadmissible also for failure to warn petitioner of his rights. Furthermore, the error, as this court holds it, of admitting the question-and-answer transcript was committed in the State's case, well in advance of petitioner's taking the stand. Cf. Henry v. Mississippi, supra, 379 U.S. at 449 n. 6, 85 S.Ct. at 568. And, finally, the attacks upon the confessions were primarily made to, and were for decision by, the trial judge—and most obviously so with respect to the kind of legal flaw in issue here—so that there would never have been a real danger of self-contradiction in the position petitioner presented to the jury.

It remains to acknowledge what must surely be apparent—that the judgment to invalidate petitioner's conviction is not reached "as an easy decision." Culombe v. Connecticut, supra, 367 U.S. at 635, 81 S.Ct. at 1896. The trial was long and was conducted with thoughtful care. The evidence of guilt was powerful. The few offensive words spoken to petitioner by the prosecutor in the police station were passed quickly and uneventfully when they were read to the jury. Defense counsel made no specific point of them, then or later. To a fellow trial judge, knowing the limits of even the most devoted attention, there is a wry aspect to a holding that an incident so small in its physical manifestation on the record should lead to nullification of a jury's verdict. But the interest to be served outweighs such considerations. The error was not in the reading of the wrongful words to the jury. The error lay in allowing the ensuing confession to be heard. Unlike defense counsel and the trial judge, the representatives of the State had been in possession of the transcript for many months and had been able to study at leisure its possible infirmities. Respondent's reference now to "strategic" failures to object should remind us that the first choice of strategy is for the State. It is at least open to question how far that choice should be held to allow the proffering of illicit evidence in the hope that resulting quandaries of defense counsel may ground procedural arguments for ignoring the wrong. What matters most, after all, is that the State, disentitled to build its system of criminal justice on the premise that citizens will be unaware of their constitutional rights, Escobedo v. State of Illinois, supra, 378 U.S. at 490, 84 S.Ct. at 1764, is far more clearly forbidden to have its prosecuters extract confessions by means of severely and blatantly erroneous "advice" denying such rights. In the end, there is no acceptable way to ignore or discount or treat as "harmless" the dark blemish upon the record before this court.

The petition is granted. Petitioner will be released from confinement unless within thirty days from today the State proceeds to retry him. If respondent chooses to appeal from this decision, for which purpose a certificate of probable cause is hereby granted,[14] this order is stayed pending decision or other action in the Court of Appeals.

So ordered.

---

14. See United States ex rel. Carrol v. La Vallee, 342 F.2d 641 (2d Cir. 1965); cf. Fed.R.App.Proc. 22(b), scheduled to become effective July 1, 1968.