UNITED STATES of America ex rel.
LeRoy VANDERHORST, Relator-
Appellee,

v.

Hon. J. Edwin LaVALLEE, as Warden of
Auburn State Prison, Auburn, New
York, Respondent-Appellant.

No. 101, Docket 32499.

United States Court of Appeals
Second Circuit.

Submitted to the Court in banc
Aug. 11, 1969.

Decided Oct. 10, 1969.

Lumbard, Chief Judge, and Moore, Friendly and Hays, Circuit Judges, dissented.

William E. Hellerstein, New York City, for relator-appellee.

Joel Lewittes, Asst. Atty. Gen., State of New York (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., State of New York, on the brief), for respondent-appellant.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.

ANDERSON, Circuit Judge (with whom Judges WATERMAN, SMITH, KAUFMAN and FEINBERG concur):

The judgment of the District Court is affirmed on the opinion of Judge Frankel, reported at 285 F.Supp. 233. We add only these few comments.

This case does not raise the issue of whether a defendant who fails to preserve an objection to evidence in a state court may later assert it in a habeas corpus petition, cf. Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Vanderhorst's precise claim, that his confession was involuntary because of an assistant district attorney's deliberately misleading advice concerning his right to remain silent, was not argued at trial; but it was asserted in the state court on appeal.[1] Judge Frankel relied on the holding of People v. McLucas, 15 N.Y.2d 167, 256 N.Y.S.2d 799, 204 N.E.2d 846 (1965), that "no exception is necessary to preserve for appellate review a deprivation of a fundamental constitutional right," as authority for disposing of the simple waiver argument to clear the way for application of the deliberate by-pass test of *Henry*. It is our opinion that he properly did so, since the later New York case of People v. De Renzzio, 19 N.Y.2d 45, 277 N.Y.S.2d 668, 224 N.E. 2d 97 (1966), modified the *McLucas* doctrine only in the limited situation where a defendant failed entirely to object to admission of a confession and then made affirmative use, himself, at the trial of the evidence he was disputing on appeal;[2] and People v. Arthur, 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968), reaffirmed the basic rule. Because a constitutional issue may be raised for the first time on appeal in New York,[3] and since this

---

1. Vanderhorst's conviction was affirmed by the Appellate Division without opinion, and both leave to appeal to the New York Court of Appeals and a petition for certiorari to the United States Supreme Court were denied. We, therefore, cannot determine whether this claim was ever disposed of on the merits.

2. There is no factual parallel between the instant case and *De Renzzio*, where defense counsel raised no objection to the admission of a confession and then read excerpts from it to the jury in his summation in order to cite exculpatory statements allegedly indicating De Renzzio had taken a less significant part in the crime than his companions. Vanderhorst's lawyer used the improperly-obtained confession to cross-examine the stenographer only after it had been admitted over his objections, and it is difficult to understand how responsible counsel could have done otherwise once the trial court overruled his protests. Comparing this to the strategic affirmative use made of a confession, which met no objection whatsoever at trial in *De Renzzio*, would allow the *McLucas* rule to be swallowed up by its exception, as New York's Court of Appeals has indicated it will not do. People v. Arthur, 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968); see United States ex rel. Forella v. Follette, 405 F.2d 680, 681 n. 1 (2 Cir. 1969).

3. Appellant not only disputes the existence of this New York rule but also argues that it is contrary to our holding that on direct appeal federal courts need not review errors, the grounds for objection to which are not called to the attention of the trial judge, even if such errors involve constitutional rights. United States v. Indiviglio, 352 F.2d 276 (2 Cir. en banc 1965), cert. denied 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); United States v. Re, 372 F.2d 641 (2 Cir. 1967). The parallel is not an appropriate one, however, since these cases involved attempts to raise separate and distinct issues for the first time on appeal. As discussed below in connection with the deliberate by-pass rule, no such distinct issue was involved here. In the case before us it was urged before the District Court, as it generally had been before the state trial court, that the means employed by the assistant district attorney to extract the incriminating statements exceeded constitutional limits. There was no failure "reasonably to apprise the trial judge of the grounds asserted here." United States v. Indiviglio, *supra* 352 F. 2d at 279.

Furthermore, if this case had been tried in a federal district court, this court could exercise its discretion to notice an error such as the one which occurred

was done, the petition for habeas corpus was properly before the court below. See Fay v. Noia, *supra.*

■ The District Court also found the petition was properly before it because Vanderhorst did not deliberately fail to raise a specific objection to use of his confession at the trial in a calculated attempt to by-pass either the trial judge's ruling upon it or state appeal procedures. See Henry v. Mississippi, *supra;* Fay v. Noia, *supra;* cf. Kaufman v. United States, 394 U.S. 217, 220, n. 3, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969). While it is possible to contend after the fact that the petitioner failed to claim he was misled into abandoning his right to remain silent precisely because he intended to testify later that he in fact never confessed at all, Judge Frankel appropriately described this as "imaginative recreation of a hypothetical strategy." 285 F.Supp. at 244. Vanderhorst's trial attorney did object to admission of this confession because it was involuntary, thereby acknowledging its existence. He cited as alternate grounds the allegations of (1) beating, (2) failure to advise him of his right to counsel, and (3) failure to warn him that he might remain silent. On appeal he first raised the fourth ground, deliberately misleading advice about his right to remain silent. The record supports the District Court's conclusion that Vanderhorst's lawyer, already entwined in conflicting testimony and theories and seeking to object to a highly damaging confession on every ground available, simply overlooked an opportunity to point out the assistant district attorney's improper interpretation of "voluntary." Defendant's attorney did not know of this error at the preliminary hearing because he had not yet seen the transcript of the confession, yet as early as this he objected that the confession was involuntary. As Judge Frankel appropriately notes,

"Unlike defense counsel and the trial judge, the representatives of the State had been in possession of the transcript for many months and had been able to study at leisure its possible infirmities. Respondent's reference now to 'strategic' failures to object should remind us that the first choice of strategy is for the State. It is at least open to question how far that choice should be held to allow the proffering of illicit evidence in the hope that resulting quandaries of defense counsel may ground procedural arguments for ignoring the wrong." 285 F.Supp. at 244.

■ Finally, we reiterate that the interrogation of the defendant by the assistant district attorney, which did not meet federal constitutional standards of voluntariness, was far from harmless. The crucial statement improperly elicited was the following:

"Q. And was that the reason that you shot Harold Johnson, to get his money? A. No, that is not the reason. I don't know what it is.

Q. Did you tell me that earlier when I asked you was that the reason?

A. That had to be the reason.

Q. Is that the reason? A. That is the reason. That is the reason.

Q. Tell be in your own words, was that the reason you shot Harold Johnson was to get his money, is that correct? A. Yes" (Tr. 463–467).

This was the evidence which supported a conviction for murder rather than manslaughter. Before the confession was read into evidence, Frank Sorbera, the brother of defendant's employer, had testified concerning $48 which Vanderhorst had been paid by one of the employer's clients, to be turned in to the firm:

"Q. What conversation did you have with this defendant? A. Well, Mr. Vanderhorst told me that he couldn't

---

here notwithstanding a failure to raise sufficient objection below, under Rule 52(b), F.R.Crim.P., which provides for review of "plain errors or defects affect-

ing substantial rights" which were not mentioned below. United States v. Indiviglio, *supra* at 280.

bring up the $48 because he was sleeping—he had slept in some friend's house and somehow or other someone rifled his pants and took the $48 out of his pocket. He didn't tell me who" (Tr. 419).

With knowledge of this conversation which had occurred a week earlier, the employer Louis Sorbera asked the defendant during questioning at the police station whether his friend, the deceased, had taken the $48. Sorbera testified that Vanderhorst, who had already been questioned by detectives at the precinct stationhouse, then said he "believed" this to be the case, and that he had gone to see Johnson on the night of the homicide with "hopes" of obtaining the money (Tr. 429–430). Louis Sorbera admitted on cross-examination, however, that while Vanderhorst had said he thought Johnson "might" have taken the $48, he never stated whether or not Johnson was the friend at whose house he had been sleeping when the money mysteriously disappeared (Tr. 438–439). There was no testimony concerning whether Vanderhorst had gone to see Johnson to inquire about money lost at his house to persons possibly unknown, or whether his "hopes" of retrieving the $48 were of a more specific and malicious nature. Vanderhorst's statement improperly elicited by the assistant district attorney was then introduced, providing the key element in establishing the motive which supported the murder conviction.

LUMBARD, Chief Judge (with whom MOORE, FRIENDLY and HAYS, Circuit Judges, concur), dissenting:

I dissent.

LeRoy Vanderhorst was convicted of murder in the second degree for killing one Harold Johnson on the night of April 15, 1964. There is no basis for setting aside this conviction returned by a Bronx County jury after proper rulings by the state judge before trial and during the trial which held that Vanderhorst's in-custody statements and confession were voluntary.

Vanderhorst's petition sets out no facts which were not before the state court. But he does make a constitutional argument which was not made during the trial, namely that his confession was involuntary because the assistant district attorney interrogating him had misinformed him concerning the meaning of the word "voluntary." In my view this highly technical argument cannot be raised at this time since it was not made before the trial judge. Cf. United States v. D'Amico, 2d Cir., 408 F.2d 331 (per curiam). At trial Vanderhorst did claim that his confession was involuntary, but only upon the grounds that he had been beaten and that he had not been informed of his "constitutional right not to answer questions." At no time did his competent defense counsel raise an objection based on the inaccurate definition of the word "voluntary" given by the assistant district attorney.

Moreover, the circumstances of Vanderhorst's numerous in-custody statements and his Q-and-A confession were thoroughly explored at a hearing before trial and they were the subject of considerable testimony by numerous witnesses at the trial. Indeed, Vanderhorst himself took the stand and testified that he was beaten and mistreated and that, despite his mistreatment, he never gave the answers attributed to him in the Q-and-A statement. From the trial record it seems clear to me that Vanderhorst's confession was freely given, and therefore I would deny the writ even if the merits of his claim are reached in the face of his failure to object at trial.

### Vanderhorst's Arrest and Early Admissions

It is true that Vanderhorst's admissions to several persons before and after his arrest, and his Q-and-A statement given to the assistant district attorney, were of prime importance in his conviction. A review of the sequence of events leading up to and including the giving of answers in the Q-and-A state-

ment shows that at that time Vanderhorst was willing and even anxious to talk about what had happened. There was no need to mislead him or coerce him in order to get answers to questions.[1]

Two of Vanderhorst's friends, Charles Terrell and Rufus Simmons, both testified that Vanderhorst was with them the afternoon and evening of April 15, 1964, but had left them around 7:30 p. m. He rejoined them at a bar around 11:00 p. m. After spending some time in the bar, Terrell and Vanderhorst left about twelve o'clock. Terrell took Vanderhorst to an apartment at 305 West 146th Street occupied by their girl friends, Ora Holloway and Vivian Clements. According to Terrell, Vanderhorst said his best friend got shot but did not say who shot him; he had a gun with him and took the bullets out and put them in his pocket.

Rufus Simmons, a cousin of Vanderhorst, confirmed Terrell's testimony. He also said that he saw Vanderhorst the morning of April 16 and Vanderhorst told him "My friend got shot."

Ora Holloway testified that while Vanderhorst was at her apartment he hold her that two people had been fighting, that he had shot to frighten them away, and that he then realized he had shot his friend. She confirmed that Vanderhorst had a gun with him, and swore that he had said that he had just killed his best friend. Tr. 502. This testimony was corroborated by Vivian Clements, who quoted Vanderhorst as saying "I just killed my best friend." Tr. 543.

The detectives investigating the killing soon located the employers of Vanderhorst and Johnson, who both worked as security guards, and ascertained where Vanderhorst was working as a guard the afternoon and early

evening of April 16. Louis Sorbera, president of the Veterans Detective Agency, which employed Vanderhorst and Johnson, drove Detectives Flynn and Armus to Waldman's supermarket in Brooklyn where Vanderhorst was finishing work sometime after 9:00 p. m.; Sorbera then drove Vanderhorst and the detectives to the 42nd Street precinct stationhouse. Although Vanderhorst first said he had last seen Johnson a week before, when confronted with a witness at the stationhouse he immediately admitted that he saw Johnson the night of the 15th. Vanderhorst's story was that the shooting was the result of his having attempted to fit one of his .38 caliber bullets into Johnson's .32 caliber revolver at Johnson's suggestion. As he was attempting this operation Vanderhorst claimed that the gun had accidentally discharged, the bullet striking Johnson in the back of his head as he sat at a piano in the community room of the building where Vanderhorst had gone to visit Johnson.

Vanderhorst's claim that the shooting was an accident was undercut by two further admissions which he made. He told the detectives, and later the assistant district attorney, that he had taken $90 from Johnson's pocket after the shooting. At the time of his arrest Vanderhorst had on his person $120 in the form of six $20 bills. Following the completion of the Q-and-A session, Louis Sorbera, who had remained at the stationhouse during the questioning, asked Vanderhorst a key question. Some days earlier Vanderhorst had told Sorbera's brother that he could not immediately pay back a sum of $48 which he owed the company because someone had taken the money while he was sleeping. Now, on the evening after the killing of Johnson, Sorbera asked Vanderhorst if Johnson had been the per-

---

1. As we shall see, by the time of trial seven months later Vanderhorst told a far different story which required him to deny in numerous details the testimony of nine witnesses, including testimony of several of his friends. He was able to supply no corroboration for his explanations. Judge Silverman was well justified in commenting at the time of sentence that Vanderhorst had "lied his head off on the witness stand."

son who had taken the $48. Vanderhorst said yes, and stated that he had visited Johnson the evening of the killing with the hopes of obtaining the money.

At about 12:30 a. m. the detectives interrupted their questioning and took Vanderhorst to his apartment. There he produced from his dresser drawer a .32 caliber revolver with which he admitted having fired the fatal shot. This gun was later shown to have fired the bullet extracted from Johnson's head.

Thus, within three or four hours of the shooting Vanderhorst had admitted knowledge of the killing and his participation in it to three of his friends, and a few hours later he made a similar admission to his cousin, Rufus Simmons. During the following night, April 16–17, he made admissions to three detectives and to the assistant district attorney, and the more limited but crucial admission to his employer Sorbera. The jury heard testimony concerning these admissions to nine people.

### The Q-and-A Session

Vanderhorst's Q-and-A session with the assistant district attorney did add one crucial element to his previous admissions—an admission that he shot Johnson in order to obtain his money. This exchange occurred as follows:

Q. In any event, did you take any money from the pocket of Harold Johnson? A. Yes.

Q. How much did you take? A. $90 in his pocket.

Q. And was that the reason that you shot Harold Johnson, to get his money? A. No, that is not the reason. I don't know what it is.

Q. Did you tell me that earlier when I asked you was that the reason? [No such previous exchange is recorded in the transcribed Q-and-A session.] A. That had to be the reason.

Q. Is that the reason? A. That is the reason. That is the reason.

Q. Tell me in your own words, was that the reason you shot Harold Johnson was [sic] to get his money, is that correct? A. Yes.

Petitioner's constitutional claim is not directed at this crucial exchange. Rather he points to the following exchange which occurred at the beginning of the Q-and-A session:

Q. My name is Alexander E. Scheer. I am an assistant district attorney. I am going to ask you some questions and I assume that your answers will be truthful. Is that correct? A. Yes, sir.

Q. And that your answers will be voluntary and truthful. A. Yes.

*Q. Your answers will be voluntary and truthful? A. Voluntary. That means what?*

*Q. That means anything I ask you, if I ask a question, you will answer the question. A. Yes.*

Q. And you will answer the questions truthfully; is that right? A. Yes (R. 459). (Emphasis added.)

Petitioner claims that in effect he was told that he had to answer every question put to him, i. e., that he did not have the right to remain silent as guaranteed by the Fifth and Fourteenth Amendments. But whatever the merits of this claim, it was never specifically made to the trial judge.

### State Court Proceedings

On November 10 and 12, 1964, before the trial began, Judge Silverman held a preliminary hearing on the voluntariness of the confession, pursuant to the command of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908, 1 A.L.R.3d 205 (1964), decided a few months before. The defendant called three city detectives who testified to the facts surrounding the arrest and questioning of defendant in a manner entirely consistent with their later testimony at trial, oulined above. They also testified that Vanderhorst had not been advised of his right to remain silent or his right to consult a

lawyer, but that he had not asked for counsel and had not been beaten or coerced in any way. The defendant did not testify at the hearing. Nevertheless counsel argued that the confession and admissions should be excluded because Vanderhorst had been beaten, his requests for counsel had been denied, and he had not been advised of his rights.

Judge Silverman denied the defense motions in a detailed statement in which he found that the admissions were made voluntarily. He also found that Vanderhorst had not been "informed that he had a right to counsel or that he had a right not to answer questions. Neither was he informed of the contrary." However, it must be noted that at the time of the hearing neither the judge nor defense counsel knew the contents of the Q-and-A statement, and thus it was not until the statement was read to the jury on the third day of trial, eight days later, that the particular exchange concerning the word "voluntary" was called to their attention.

At trial no objection was made to the Q-and-A statement at the time it was introduced by being read into the record by the stenographer. Defense counsel instead proceeded to cross-examine the stenographer by reading to him many of the questions and answers from the statement, including the Q-and-A relating to the word "voluntary." Apparently counsel's purpose was to show that the stenographer did not record all that was said and that he had erroneously recorded what had been read to the jury. But counsel had not forgotten the motion to suppress, for he also brought out on cross-examination that the assistant district attorney had not advised Vanderhorst that anything he said might be held against him and that he had a right to counsel.

A few days later, after the state had rested, counsel moved to exclude stenographer Wasserman's testimony in reading the Q-and-A statement, giving as his reasons (S.M. 547):

" * * * that the record indicates that the defendant was booked at about one or 1:30 p. m., a. m. rather and that the interrogation by Mr. Scheer took place after he was booked and that the defendant was not advised of his constitutional right not to answer questions, was not advised of his constitutional right to have counsel, and upon those grounds and the Escobito (sic) case and the Constitution of the United States I most respectfully submit that the defendant's constitutional rights have been violated if the Q and A is permitted in the record * * *."

In answer to the court's question, counsel said that his motion differed from the pre-trial application only in that it had now been affirmatively established that the defendant was not advised of his constitutional rights: " * * * I am now directing your Honor's attention to the interrogation by the District Attorney which took place after the booking. * * *" At no time did counsel call the judge's attention to the exchange relating to "voluntary", nor did he purport to base his constitutional argument on that exchange.

### Vanderhorst's Testimony

Vanderhorst took the stand in his own defense and denied making incriminating admissions to anybody. He testified that he visited Johnson at 6:45 p. m. at the apartment house where Johnson was on guard duty. Johnson asked Vanderhorst if he could get him something to eat, and Vanderhorst left and drove in Simmons' Mercury to Prospect Avenue and brought back to Johnson a meat loaf sandwich and some Seven-Up. When Vanderhorst left at 7:30 Johnson was there with some "little kid" and was eating the sandwich. He said that about 7:55 p. m. he rejoined Terrell and Simmons with whom he had been earlier—contrary to the testimony of Terrell and Simmons who said he did not return until after 11:00 p. m. Simmons also testified in rebuttal that Vanderhorst had not used his car. Van-

derhorst swore that when he and Terrell went to the girls' apartment at midnight the girls were just going to bed and that they left without talking with anyone there.

Vanderhorst swore that at the police station the following night he was refused permission to telephone, both by the detectives and the assistant district attorney. He claimed that the detectives had hit him with a phone book and that all four detectives had beaten him up, and that they had jammed a baseball bat in his crotch. He admitted that he did show the police a gun in his dresser drawer but claimed it had been a .38 and not the gun produced in court as the murder weapon. He said that the assistant district attorney did ask him questions but that the stenographer did not take them down. According to Vanderhorst, he gave only his name, address, and age, and did not make the answers testified to by the stenographer.

Vanderhorst was not asked about the colloquy which, according to the stenographer, he had with the assistant district attorney regarding "voluntary," nor was he asked if he knew the meaning of the word. Obviously any questions on this subject elicited by his own counsel would have seemed inconsistent with his denial that he had ever given the detailed answers taken down by the stenographer.

Even in his affidavit in support of his petition in the district court Vanderhorst does not claim that his statement was not freely made; he does not claim that he did not know the meaning of "voluntary"; he says nothing more than that he is entitled to the relief he is seeking. The petition is supported only by allegations of fact based entirely upon the record at the trial, together with arguments by his Legal Aid counsel.

After both sides had rested, Judge Silverman reaffirmed his findings. He noted that during the trial additional evidence bore on the issues of the voluntariness of the "statements, confessions or admissions" and he stated his adherence to the ruling that the statements were voluntary.

The Appellate Division unanimously affirmed without opinion (27 A.D.2d 904, 280 N.Y.S.2d 532 [1st Dept. 1967]) and leave to appeal to the New York Court of Appeals was denied on May 11, 1967. The Supreme Court denied certiorari, 389 U.S. 1058, 88 S.Ct. 795, 19 L.Ed.2d 858 (1968).

### The Opinion Below

The district court found that the jury's verdict was "plainly sufficient" to support the verdict of guilty, upon the theory that Vanderhorst "intentionally though without premeditation and deliberation, * * * had shot and killed Johnson" and then taken his money, "though he had not been embarked on the crime of robbery before the shooting." United States ex rel. Vanderhorst v. LaVallee, 285 F.Supp. 233, 236 (S.D.N.Y.1968).

With respect to the constitutional claim petitioner asserts in this habeas corpus proceeding the district court found these uncontroverted facts:

"[P]etitioner's counsel did attack as involuntary and inadmissible all of petitioner's admissions, to the police as well as the prosecutor, but his reliance was upon alleged beatings in the police station and the failure to advise petitioner along the lines later to be required under *Miranda*. *No mention was made of the erroneous advice given by the assistant district attorney*. In the pre-trial hearing, this factor was unknown. *But when it was spread upon the record, no specific objection was made focusing upon the fault here held to be the vital one. Neither at the time when the question-and-answer transcript was read nor at any later point in the trial court was this omission repaired*. For this reason, respondent urges, the point was waived." 285 F.Supp. at 243 (emphasis added).

Despite these conclusions, the district court held that petitioner had not waived

the claim he now asserts on habeas corpus; the court granted the writ, finding that Vanderhorst's confession was involuntary. The court found that the claim relating to the definition of "voluntary" given by the assistant district attorney was not "a wholly novel objection raised for the first time" on habeas corpus after being ignored at the trial, but rather was merely "an additional 'argument'" in support of the trial motion to suppress on the ground that petitioner had not been warned of his rights. But the district court also believed that under New York law the defendant could have raised his claim on appeal to the Appellate Division even if he had not raised it at trial, citing N.Y. Code of Crim.Proc. § 527; People v. McLucas, 15 N.Y.2d 167, 256 N.Y.S. 2d 799, 802, 204 N.E.2d 846 (1965).

### The Law: The New York Rule on Failure to Raise a Constitutional Objection at Trial

Contrary to the district court's view, the New York rule is that a conscious, strategic decision by defense counsel not to make a contemporaneous objection at trial bars the raising of even a constitutional claim on appeal. People v. De Renzzio, 19 N.Y.2d 45, 277 N.Y.S.2d 668, 224 N.E.2d 97 (1966); see also, United States ex rel. Forella v. Follette, 405 F.2d 680, 681–682 n. 1 (2d Cir. 1969) (dictum). In De Renzzio Judge Bergan lucidly elaborated the reasoning behind this rule:

> "In looking at this aspect of the case [the question of whether a contemporaneous objection is needed to preserve a claim on appeal] we approach, indeed, the vital center of the adversary system. The Constitution in guaranteeing the accused in a criminal case the 'Assistance of Counsel for his defence' deals neither with a shadowy figure standing beside the accused nor with an abstract ideal. It envisages a lawyer, skilled in advocacy, a match for the prosecutor, and in full control of the management of the defense at the trial.

> "If such a lawyer chooses not to raise a point of constitutional law in a professionally competent defense, either because he believes he could use material affirmatively to advantage or because he believes it better for his client not to raise it, we would work fundamental changes in the adversary system if we determine he should have done that which he had decided advisedly not to do." 19 N.Y.2d at 50–51, 277 N.Y.S.2d at 671, 224 N.E.2d at 99.

In People v. Arthur, 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968), the New York Court of Appeals indicated that it would limit the De Renzzio rule to situations where "trial counsel not only failed to object to the introduction of * * * [the] statements but * * * strategically used them in defense of his client." 22 N.Y. 2d at 329, 292 N.Y.S.2d at 666, 239 N.E.2d at 539. In the present case, this is exactly what happened. As pointed out above, Vanderhorst's counsel cross-examined the stenographer by reading many of the questions and answers from the statement, including those portions of the Q-and-A urged in this petition. Moreover, Arthur involved a negligent failure to object by defense counsel; the case before us, as will be discussed more fully below, involves a deliberate decision by defense counsel not to make the objection to the introduction of the Q-and-A statements relating to the meaning of "voluntary." Thus, New York law provides no support for the issuance of the writ in this case.

It seems clear that New York's rule requiring an objection at trial in the circumstances of this case must be applied by a federal habeas court. Henry v. Mississippi, 379 U.S. 443, 447–448, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). The opinion of this court seemingly to the contrary, United States ex rel. Everett v. Murphy, 2 Cir., 329 F.2d 68, 70, cert. denied 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964), evidenced no knowledge of the New York rule and,

in any event, is no longer good authority in light of Henry. See United States ex rel. Forella v. Follette, 269 F.Supp. 627, 628, 629 (S.D.N.Y.1967), aff'd on other grounds 405 F.2d 680.

This New York test cannot be satisfied by petitioner here since his trial counsel made only a general objection to the admissibility of the confession on the ground that "the defendant was not advised of his constitutional right not to answer questions." At no time did defense counsel call the judge's attention to the particular statement by the interrogator which is the sole ground of the habeas corpus application; indeed, he made affirmative use of that statement in his cross examination of the stenographer. Therefore, under *De Renzzio* and *Arthur* petitioner waived any claim based on this statement. Nor are there any exceptional circumstances in this case to support any conceivable exception to this test: there is no doubt of Vanderhorst's guilt; he was competently represented by counsel; and his trial was completely fair.

### The Law: Deliberate By-Pass of State Procedures

Quite aside from the New York rule and *Henry*, I would deny the writ on the ground that the failure of counsel to object was pursuant to a conscious trial strategy, in which the defendant actively participated, and thus constituted a "deliberate by-passing" of orderly state procedures barring petitioner from raising his claim in habeas corpus proceedings. This federal rule parallels the New York practice as enunciated in *De Renzzio* and *Arthur*. The apparent trial strategy was for Vanderhorst to take the stand and deny that he had given any answers at all to the assistant district attorney other than to state his pedigree, thus accusing the stenographer of falsifying the rest of the Q-and-A statement introduced at trial. The general objection which was made at trial, i. e., that Vanderhorst had not been warned of his right not to answer questions, was not incon-

sistent with this strategy as executed in Vanderhorst's testimony. But if counsel had made an objection which admitted that Vanderhorst had stated more than his pedigree, i. e., that he had asked the meaning of the word "voluntary," he would have directly contradicted the testimony of his client and reenforced the credibility of the stenographer's testimony that the Q-and-A session had taken place as recorded.

The other objections which defense counsel made were not inconsistent with the basic strategy concerning the inaccuracy of the stenographer's transcription. The objections dealing with beatings by the detectives and the omission of certain warnings in no way admitted the accuracy of the transcript, since they did not depend upon the content of the Q-and-A as recorded. But to raise an objection based on the definition of the word "voluntary" would have required reliance on the very transcript that the defense was seeking so earnestly to discredit.

It is settled that a defendant who has deliberately by-passed orderly state procedures in declining to make an objection at trial may not be allowed to raise the claim in a federal habeas corpus proceeding. Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Having elected, upon the advice of competent counsel, to try his case under one strategy petitioner should not be allowed to choose a second strategy in attacking the conviction in the federal courts. This is especially so when it is clear that the state courts would decline to give petitioner this second choice after a conscious failure to object at trial. Thus, I would deny the writ because it is obvious that the failure to object was part of a conscious trial strategy approved by petitioner.

### Vanderhorst's Q-and-A Statement and Other Admissions Were Voluntary

Even if petitioner's claim is reached, the record amply supports the trial judge's finding before trial that the ad-

missions were voluntary. The testimony given at the trial before the jury gave further support of the strongest nature to this finding. It developed that Vanderhorst had talked freely with friends as well as with the detectives and his employer and that he continued to do so to the assistant district attorney. While Vanderhorst denied all this when testifying seven months later at the trial, his testimony was of such a nature that the trial judge commented at the time of sentencing that he had "lied his head off." The Q-and-A statement itself gives evidence that Vanderhorst was speaking freely. Many of his answers were detailed and lengthy; he seems to be talking about matters which he wants to relate.[2]

Under all the circumstances, regardless of whether Vanderhorst did or did not know the meaning of the word "voluntary" as the assistant district attorney used it, the important question and the only question is whether he in fact did speak willingly and freely and not because he was improperly coerced or under fear when he did so. The record compels an affirmative answer. Indeed, during the hours immediately after the killing he seemed anxious to talk about the killing as if it relieved his conscience to do so, despite the fact that his detailed explanations were patently incredible in many respects.

### Conclusion

I conclude that if there ever was a case where we can rest secure on the findings of a distinguished and experienced state trial judge and the well-supported verdict of a jury it is this case. Vanderhorst was represented by competent and experienced counsel who did the best he could with a defendant who chose to testify in his own behalf in such a manner that he ended up by convincing the jury that he and Johnson had been drinking, that they had quarreled over Vanderhorst's claim that Johnson return to him money he had taken a few days before, and that Vanderhorst had shot Johnson in the back of the head and taken Johnson's money. The brief exchange between Vanderhorst and the assistant district attorney concerning the word "voluntary" was never called to the attention of the trial judge by defense counsel pursuant to petitioner's trial strategy, and, in light of the trial record, any argument based on this exchange would have been trivial and unconvincing.

I can find no reason in law or common sense which would justify federal interference with Vanderhorst's conviction for murder in the second degree.

---

2. Excerpts from the Q-and-A statement are printed as part of the district court's opinion below. 285 F.Supp. 233, 237–238 n. 2.