**UNITED STATES of America ex rel. Robert CLAYTON, Petitioner,**

v.

**Vincent MANCUSI, Warden of Attica Prison, Attica, N. Y., Respondent.**

No. 69-C-1275.

United States District Court,
E. D. New York.

May 13, 1971.

Maurice Brill, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for respondent; Mortimer Sattler, Asst. Atty. Gen., New York City, of counsel.

BARTELS, District Judge.

Petitioner, Robert Clayton, presently incarcerated in Attica Correctional Facility, Attica, N. Y., upon conviction, after a jury trial, of second degree murder, seeks his release through federal *habeas corpus*. He was sentenced to a term of thirty years to life imprisonment on February 25, 1953, and no appeal was taken from the judgment of conviction. His principal claim for release is the introduction at trial of his involuntary confessions in violation of his constitutional rights.

Pursuant to the decisions of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), a *coram nobis* hearing was held on June 8th and 9th, 1965, in the County Court, Suffolk County, upon the issue of voluntariness. After making skeleton findings of historical fact, the County Court concluded "as a matter of fact and law" that the confessions were voluntary. That decision was affirmed by the Appellate Division, Second Department (People v. Clayton, 28 A.D.2d 543, 279 N.Y.S.2d 605 (2d Dept. 1967), Judge Christ dissenting upon the ground that the confessions were involuntarily obtained.[1] The Court of Appeals affirmed without opinion, 22 N.Y.2d 841, 293 N.Y.S.2d 104, 239 N.E. 2d 734 (1968), and the Supreme Court denied certiorari, 394 U.S. 909, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969). Clayton thereupon filed the instant petition, asserting that his confessions were involuntary on the following grounds: (1) unreasonable delay in arraignment for more than sixty hours after his initial detention; (2) unlawful detention as a material witness prior to his confession;

(3) subjection to continuous interrogation; (4) removal from police headquarters to the scene of the crime on two occasions; (5) denial of food and sleep during his detention; (6) failure to receive advice of the right to counsel and the right to remain silent; and (7) his limited intellectual capacity and poor education. Counsel was appointed by this court and a hearing subsequently held.

As no direct appeal was ever taken from the judgment of conviction, a certified transcript of the stenographer's trial notes was never made.[2] While certain uncertified portions of trial testimony of some witnesses (which apparently had been ordered by counsel for one or both sides during or after trial) have been produced from the files of the District Attorney, these out-of-sequence testimonial fragments have been of only limited use to the court, and primary reliance has of necessity been placed upon the minutes of the State and Federal proceedings for collateral relief.

I

According to the *coram nobis* minutes, as supplemented by the transcript of the evidentiary hearing held in this court and portions of the trial testimony, the facts are as follows:

On November 3, 1952, at about 3 P.M., Clayton, an indigent, semi-literate potato picker on the Gozelski farm in East Northport, Long Island, was taken into custody along with approximately ten or eleven other people either employed or living at the farm, and brought to the Huntington Town Police Department headquarters for questioning in connection with a homicide which had occurred on the premises the previous day. Upon

---

1. The majority held that Clayton's illegal commitment as a material witness effectively amounted to the commencement of criminal proceedings against him, but that New York cases declaring confessions obtained thereafter inadmissible *per se* were not to be accorded retroactive application. The question of voluntariness under the totality of the circumstances was not discussed by the majority.

2. The District Attorney's office of Suffolk County has informed the court that such a transcript is unavailable. Apparently, two stenographers were assigned to Clayton's trial. One has lost or destroyed his notes, and the other is retired and cannot be located.

arriving at the stationhouse, Clayton and the others were placed in a room behind the sergeant's desk, used primarily as a place for the changing of the policemen's shifts every eight hours. It was described as "a very small place," approximately 20 feet by 10 feet. The only furniture in the room consisted of a table and four or five armless wooden chairs. The lights in the room remained on all night. From time to time all through the night of November 3rd Clayton and the others were taken one at a time from the room to another, smaller room on the second floor for questioning by a group of police officers. Some questioning was also conducted in the larger room in the presence of all those in custody. Detective William Van Size, who was among others assigned to the homicide investigation, testified that he specifically spoke to Clayton at about 5 or 6 P.M. on November 3rd. At about 5 A.M. on November 4th a stenographer, Victor Bruns, was called in to transcribe a battery of questions put to Clayton by a team of interrogators, consisting of Walter Weeks, an investigator with the District Attorney's office, Detective Van Size, and another detective, Alfred Kohler. Clayton's answers were also recorded, in the course of which he denied any connection with the homicide and in fact expressed his desire to bring the culprit to justice. The questioning lasted approximately forty-five minutes. Sometime during the late afternoon or evening of November 4th, Clayton was confronted by one B. J. Mickens, a co-worker, who stated that Clayton had killed the deceased and that he (Mickens) had helped Clayton carry the victim's body into the potato shed, where it was later discovered. Clayton nevertheless re-asserted his innocence and Mickens subsequently retracted his accusation.[3] Clayton was again questioned at 5 or 6 o'clock the evening of November 4th. At approximately 9 o'clock on the evening of November 4th Clayton and Mickens were both "arraigned" before Judge Fred Munder as "material witnesses". Immediately thereafter Clayton was remanded to the custody of the Sheriff of Suffolk County, in lieu of $10,000 bail, and placed alone in a small cell or lockup, designed primarily for temporary detentions, containing a flat board, without a mattress, as the sole sleeping facility. He remained in that cell until he was arraigned on the charge of murder on November 6th, except for the periods he was removed for questioning.

On November 5th he was questioned several times during the day and may have been taken out to the scene of the crime that afternoon, although this is not clear.[4] Following an interrogation of about one and a half to two and a half hours that evening, Clayton, in response to a series of questions propounded by Weeks, in the presence of Deputy Sheriff Otis Barnes and the stenographer, Victor Bruns, finally admitted the homicide. The interrogation was recorded on tape and by the stenographer beginning at 10:10 P.M. on November 5th and was concluded at approximately 10:45 o'clock

3. Prior to these events, on the afternoon of November 3rd, Mickens had confessed to the murder but immediately thereafter recanted that confession. A later police investigation revealed that Mickens could not have been at the farm at the time of the homicide.

4. The testimony on this point is contradictory. At the State coram nobis hearing, Van Size testified that Clayton was taken to the farm on the afternoon of the 5th. However, Judge Stark's findings of fact were silent as to a trip at that time. At the hearing before this court, an attempted exploration of the matter resulted in considerable confusion, Van Size insisting that while Clayton was taken to the farm on two occasions, both trips occurred subsequent to the confession on the evening of the 5th. A careful reading of the trial testimony of Kohler, however, suggests that, in all, three trips to the farm were made. The first, *without* Clayton, was made by a number of police officers on the afternoon of the 5th; the second, *with* Clayton, was made following the confession on the evening of the 5th; and the third, also with Clayton, was made on the afternoon of the 6th, subsequent to his amendment of the prior confession.

the same evening, although Weeks testified that the evening interrogation actually commenced at about 8 or 9 P.M.

Following this confession, Clayton, accompanied by more than ten police officers and investigators, was transported to the farm sometime around 11:30 P.M., where he proceeded to point out to the officers a number of objects connected with the homicide, which were seized by the investigators as evidence. The trial transcript reveals that further incriminating statements were made at the farm and introduced at the trial. Following Clayton's return to police headquarters, his earlier confession, which had in the meantime been transcribed from the stenographer's shorthand notes, was read to him, beginning at 2:16 A.M. on November 6th. He then dictated various changes which he later initialed, the entire process ending at about 3 A.M. At 3:12 A.M. Clayton requested permission to send a telegram to his mother. The request was granted and the telegram, in which Clayton stated "I have killed a man", was admitted into evidence and read to the jury. Later that day Clayton was arraigned on a charge of murder.

## II

The crucial question here presented is whether Clayton's confessions were voluntary under the "totality of the circumstances" (Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Clewis v. Texas, 386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967)) and "the product of an essentially free and unconstrained choice" (Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)), rather than the product of a will overborne. Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). Upon this question, Clayton's guilt or innocence is immaterial.

After a review of all the available evidence, it is my view that the facts of this case reveal a clear pattern of police dominance and psychological coercion which rendered the resultant confessions [5] inadmissible under the foregoing constitutional standards. Among the factors which I believe compel this conclusion are the following:

(1) During the 55-hour period of custody prior to Clayton's first inculpatory statement, he was never advised of his right to counsel, his right to remain silent, or that what he said could be used against him in evidence.[6] While the failure to advise an accused of these rights at the outset of interrogation does not automatically render confessions inadmissible in trials occurring prior to the holding in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it is nonetheless "a significant factor in considering the voluntariness of statements later made". Davis v. North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); Johnson v. New Jersey, 384

5. As best as can be determined from the fragmentary record, a typewritten transcript of the stenographer's shorthand notes taken at Huntington Police Headquarters on November 7, 1952, when a wire recording of the initial confession was played back, was introduced into evidence at the trial as People's Exhibit 30. In addition, the uncertified portions of trial transcript reveal that the stenographer read into the record a transcript of his original shorthand notes made during the initial confession on the evening of the 5th. There are some minor variations between the two transcripts. The stenographer also read into the record the transcript of his notes of the interrogation in the early morning hours of the 6th, during which Clayton amended in some respects his earlier confession.

6. At the hearing before this court, Weeks testified that just prior to the questioning of Clayton on the evening of the 5th, he advised Clayton that anything he said could be held against him in a court of law. However, the stenographer's transcript of the questioning does not indicate that any such warning was given. In any event, Weeks admitted that he never advised Clayton of any other of his constitutional rights during the period prior to the confession.

U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Haynes v. Washington, 373 U.S. 503, 510–511, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Culombe v. Connecticut, *supra,* 367 U.S. at 610, 81 S.Ct. 1860; Turner v. Pennsylvania, 338 U.S. 62, 64, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949).

(2) Clayton's statements were secured following an initial taking-into-custody which was apparently without probable cause and followed by 55 hours of intermittent interrogation before he confessed. Approximately 30 hours after he was brought to the stationhouse, he was illegally arraigned as a "material witness", no criminal proceedings having been formally instituted at that time against anyone in connection with the homicide, in violation of the applicable New York statute.[7] There can be no doubt that at this point Clayton had become the target of the investigation and as stated by the majority of the Appellate Division, "defendant's commitment as a material witness * * * effectively amounted to the commencement of criminal proceedings against him" (28 A.D.2d at 543, 279 N.Y.S.2d at 606). Of all those originally taken into custody, only Mickens and Clayton were held as material witnesses and thereafter segregated from the others. Had Clayton been arraigned as a defendant, he would have thereupon been informed of his right to counsel. New York Code of Criminal Procedure, § 308. The conclusion is virtually inescapable that the "material witness" proceedings were a sham, designed to prevent Clayton from obtaining counsel and to insure his availability for further interrogation away from the modicum of societal reinforcement which had theretofore been supplied by the group of suspects. *Cf.* United States ex rel. Weinstein v. Fay, 333 F.2d 815 (2d Cir. 1964).

United States ex rel. Glinton v. Denno, 309 F.2d 543 (2d Cir. 1962), cert. denied, 372 U.S. 938, 83 S.Ct. 886, 9 L.Ed.2d 769 (1963); *Id.,* 339 F.2d 872 (2d Cir. 1964), cert. denied, 381 U.S. 929, 85 S.Ct.

1570, 14 L.Ed.2d 688 (1965), and United States ex rel. Allen v. LaVallee, 411 F.2d 241 (2d Cir. 1969), cert. denied, 396 U.S. 971, 90 S.Ct. 458, 24 L.Ed.2d 438 (1969), are not to the contrary. In the *Glinton* cases, the original detention as a material witness was valid and was subsequently rendered only technically illegal as a result of the discharge of the grand jury. In addition, Glinton was at all relevant times represented by an attorney and had been advised by the court and his attorney at his initial arraignment of his right to remain silent. While detained, Glinton made several conflicting exculpatory statements which were later used by the prosecution as evidence of his guilty mind. The statements were found to have been in all other respects voluntary. The court merely held that a statement rendered during an illegal detention was not inadmissible *per se,* stating: "Where the *only basis* for alleging that due process has been violated is the use of statements obtained during an illegal detention" (emphasis supplied), a state conviction would not be upset. However, the illegal detention of the accused is a factor to be weighed in the determination of voluntariness. Clewis v. Texas, *supra.*

In *Allen, supra,* the court stressed that the defendant was *in fact* "a material witness" since he had been placed at the time and place of the crime with the prime suspect. Moreover, an eye witness had indicated that Allen did not strike the victim. Considering all the testimony on this issue before this court as well as the state court *coram nobis* transcript, it is my conclusion that Clayton's arraignment as a material witness was a sham, designed by the police to retain their dominance over him until they could extract a confession.

(3) The unreasonable delay in Clayton's arraignment as a defendant until some 60 hours after being brought into custody and more than 30 hours after he had clearly become the target of the investigation, is certainly a factor in deter-

---

7. New York Code of Criminal Procedure, § 618–b.

mining voluntariness. United States ex rel. Williams v. Fay, 323 F.2d 65, 69 (2d Cir. 1963), cert. denied, 376 U.S. 915, 84 S.Ct. 667, 11 L.Ed.2d 611 (1964); United States ex rel. Wade v. Jackson, 256 F.2d 7, 15 (2d Cir. 1958), cert. denied, 357 U.S. 908, 78 S.Ct. 1152, 2 L.Ed.2d 1158 (1958).

(4) The record indicates that Clayton's faculties might well have been impaired and his will to resist significantly eroded by inadequate sleep and food. While there is some testimony to support the County Court's finding that Clayton was "permitted to sleep," the record raises substantial concern as to whether the treatment to which he was subjected substantially and effectively precluded sleep. During his stay in the back room of the stationhouse, from the afternoon of November 3rd to about 9 P.M. on November 4th, the only facilities for sleep were the floor, a long table and five armless wooden chairs. These facilities were to accommodate the sleeping needs of about ten people. The lights were on all night, and the ingress and egress of police officers and suspects were continued throughout Clayton's presence there. Thereafter he was removed to a cell which contained only a hard board for sleeping purposes. It is conceded that he had no sleep from his initial questioning on the early evening of November 5th until 3 A.M. the following day, when he completed the amendment of his confession, although Weeks testified that he saw Clayton sleeping on the floor just prior to the interrogation on the evening of the 5th. One witness stated "I recall them all lounging around the back room of the office, both on the floor, on the chairs and like that there" and "They were lounging around with their eyes closed and just generally lounging in the back." Detective Van Size stated "Some were sleeping on the table. One guy was sleeping under the table." At the hearing before this court, the stenographer testified that at the interrogation during which Clayton amended his confession "there was a sense of fatigue" and "a stumbling over words." Thus, there can be little doubt that while Clayton may have been permitted to assume a supine position, any sleep he may have attained was hardly adequate to refresh himself and sustain his ability to resist continued questioning. United States ex rel. Caminito v. Murphy, 222 F.2d 698, 701 (2d Cir. 1955), cert. denied, 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955); cf. Davis v. North Carolina, *supra*, 384 U.S. at 746, 86 S.Ct. 1761; United States ex rel. Castro v. LaVallee, 282 F.Supp. 718 (S.D.N.Y.1968). Similarly, while there is also some evidence to support the County Court's finding that Clayton was "fed at regular intervals," the court entertains substantial doubt that the limited menu of hamburger and coffee over a period of over sixty hours was under his conditions of confinement adequate to renew Clayton's physical strength and his will to resist interrogation. Davis v. North Carolina, *supra*, 384 U.S. at 747, 86 S.Ct. 1761.[8]

(5) The testimony of the witnesses as well as the transcripts of the various interrogations of Mickens and Clayton indicate that the suspects were exposed to persistent interrogation not by one but a team of interrogators. For example, during the questioning of Clayton in the early morning hours of November 4th, during which time he denied knowing the perpetrator of the crime, Weeks, Van Size and Kohler alternately fired questions at Clayton. Such a procedure has long been recognized as a significant factor in determining the voluntary character of a confession.[9] Watts v. Indiana, 338 U.S.

---

8. While there was testimony by Weeks at the *coram nobis* hearing that he saw Clayton eat on the evening of the 3rd, the evening of the fourth, and on the fifth, the nature of the food was never elicited. Clayton testified at the hearing before this court that prior to confessing, he was fed only on the evening of the third, and that his meal consisted of a hamburger and coffee.

9. While it appears that four people were present at the interrogation on the evening of the 5th, the record indicates that

49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968). This is particularly true where the accused did not make a narrative statement but rather, as here, was subjected to the leading questions of skillful prosecutors in a question and answer confession.[10] Spano v. New York, *supra*, 360 U.S. at 322, 79 S.Ct. 1202.

(6) The continual questioning of Clayton over the course of two and a half days' custody must have had a substantial effect in eroding his will to resist. As aptly observed by the Supreme Court in Culombe v. Connecticut, *supra*, 367 U.S. at 575, 81 S.Ct. at 1864:

"* * * questioning that is long continued—even if it is only repeated at intervals, never protracted to the point of physical exhaustion—inevitably suggests that the questioner has a right to, and expects, an answer. This is so, certainly, when the prisoner has never been told that he need not answer and when, because his commitment to custody seems to be at the will of his questioners, he has every reason to believe that he will be held and interrogated until he speaks."

*Cf.* Davis v. North Carolina, *supra*, 384 U.S. at 752, 86 S.Ct. 1761. This suggestion was especially applicable where Clayton was, at the outset, detained in a room with a number of co-workers, thus providing limited societal reinforcement, but was later removed to the confines of a small cell where his contacts were limited almost exclusively to the police.

The somewhat corroborative trial testimony of Elinora Burnett, Clayton's girlfriend, as to Clayton's guilt, does not lead me to believe that the introduction into evidence of Clayton's confessions was harmless error beyond a reasonable doubt. Accordingly, Clayton's conviction must be overturned. See United States v. Castello, 426 F.2d 905 (2d Cir. 1970); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### III

The State urges essentially two grounds for denial of the writ. First, it contends that the confessions were not the product of a will overborne, but rather were the result of the normal psychological drive to confess. It strongly advances the argument that the first confession was a direct result of the interrogators' confrontation of Clayton with the fact that one Mrs. Spatafora, the owner of a nearby bar, had identified Elinora Burnett, Clayton's girlfriend, as the woman who accompanied the man who cashed a $100 bill at her

---

only Weeks propounded the final series of questions leading to the confession.

10. The transcript of the question and answer session on the evening of November 5th reads, in part, as follows:

"Q Bob, I told you before you have been lying and lying. We left you alone all day long, but we have just been building up stuff. Now, I got you in here tonight to talk to you, and you continued to lie to me.

You didn't have any money. You didn't do it. Pretty near broke. You came home. When you turned the pocketbook over to Peggy, what was in it?

A When I turned it over to her, when I gave it to her—

* * * * *

Q Now, tell us the rest of it. Get it off your mind, Bob. As I said, I don't think you ever intended to kill the man. I guess it was that you just thought you were going to get the money and get out. Now, get it off your mind, Bob.

A Somebody tell me yesterday (mumbles) I am going to jail and stretch a bit.

Q Get it off your mind, Bob. You have a hell of a load. You have been sitting down there all day. You wondered why the hell we didn't talk to you. We have been out digging up this stuff all day long. The only thing you can do is tell the truth, Bob, and hope and pray that it will help you.

Now, come on. Let's have the whole story. Start Saturday night. * * * * * * * * *

Q Hold your head up. Tell us the story, Bob."

establishment shortly after the homicide. At the hearing before this court all parties, as well as the court itself, attempted to explore the incident more fully but to little avail. The memories of the witnesses had understandably dimmed in the eighteen-year interval since the trial and their testimony in this area was vague and in some respects contradictory. Consequently, they were unable to specify with any assurance the time of the confrontation, relative to the time of the confession, or otherwise, or the circumstances under which the incident occurred.[11] Moreover, it is not at all certain that Clayton's knowledge that the police had such information (which taken by itself would seem rather inconclusive on the issue of Clayton's guilt) would have prompted Clayton's confession had he not been subjected to the prior treatment outlined above. Even if one were to consider the aforementioned confrontation as the first direct accusation of Clayton or to infer that a direct accusation immediately followed the confrontation, it would be necessary, under the circumstances, to consider the Supreme Court's observation that where one in custody is not directly accused of the crime "until after a substantial period of eroding his will to resist by a tangential line of interrogation" the "coercive influence brought to bear upon him" is not thereby reduced. Davis v. North Carolina, *supra*, 384 U.S. at 752, 86 S.Ct. at 1770.

■ Next, the State's attorney suggests that in light of the State court's post-hearing adverse determination of Clayton's claims, it was improper for this court to hold a hearing or reach a contrary conclusion on the issue of voluntariness without first determining that the State court proceedings fell within one or more of the eight criteria enumerated in 28 U.S.C. § 2254(d).[12] That this court has the inherent power to hold an evidentiary hearing on any petition for a writ of *habeas corpus*, alleging facts which, if proved, would entitle the petitioner to relief, cannot be doubted. Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Procunier v. Atchley, 400 U.S. 446, 91 S.Ct.

11. As best as can be determined, Clayton was confronted with this information sometime during the afternoon of November 5th.

12. 28 U.S.C. § 2254(d) reads in pertinent part as follows:

"In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record".

**1374**

485, 27 L.Ed.2d 524 (1971). The instant petition alleges such facts.

In any event, the court made it clear from the beginning that it would not re-determine those purely historical facts as reliably found by the County Court. Recognizing that the *coram nobis* proceedings were held more than thirteen years after the events in issue, when the memories of many witnesses had understandably faded, as well as the fact that some issues might have been more fully explored by the County Court, the court concluded that a more detailed exploration of the underlying facts was necessary, as a supplement to the State record, if the ultimate determination of voluntariness was to be properly reviewed. It was concerned with the County Court's rejection of all testimony respecting Clayton's advisement *vel non* of his rights before interrogation. At the State *coram nobis* hearing, Judge Stark curtailed Clayton's attorney from eliciting whether Clayton had been advised of his right to counsel and his right to remain silent, stating "I am not going to consider that issue at all. * * * And it's totally irrelevant." Clearly, there was no finding by the County Court as to Clayton's advisement, and the rejection of such testimony, in view of other substantial evidence that actual coercion was exerted to overcome Clayton's will, raised a question as to the validity of the ultimate determination of voluntariness by the State Court. *Compare,* Procunier v. Atchley, *supra;* United States ex rel. Hughes v. McMann, 405 F.2d 773 (2d Cir. 1968).

■ The issue of voluntariness under "the totality of the circumstances" is one of those mixed questions of law and fact, the determination of which is the very function of this court in *habeas corpus* proceedings. Townsend v. Sain, *supra;* Watts v. Indiana, *supra.* As the Supreme Court observed in *Townsend, supra,* 372 U.S. at 309, n. 6, 83 S.Ct. at 755:

"By 'issues of fact' we mean to refer to what are termed basic, primary, or historical facts: facts 'in the sense of

a recital of external events and the credibility of their narrators * * *.' Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 446, 97 L.Ed. 469 * * * (opinion of Mr. Justice Frankfurter). So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense."

In *Watts, supra,* 338 U.S. at 51, 69 S.Ct. at 1348 the court also said:

"* * * 'issue of fact' is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication."

*Accord,* Imbler v. State of California, 424 F.2d 631 (9th Cir. 1970), cert. denied, 400 U.S. 865, 91 S.Ct. 100, 27 L.Ed.2d 104 (1970).

■ Even were the court to treat voluntariness as a "factual issue" within the meaning of 28 U.S.C. § 2254(d) (*cf.* United States ex rel. Coleman v. Mancusi, 423 F.2d 985 (2d Cir. 1970), cert. denied, 400 U.S. 842, 91 S.Ct. 84, 27 L.Ed.2d 77 (1970)), it concludes that such determination by the County Court in this case is not fairly supported by the record (28 U.S.C. § 2254(d) (8)) and hence subject to redetermination after an evidentiary hearing in this court. See United States ex rel. Burns v. LaVallee, 436 F.2d 1352 (2d Cir. 1970).

**IV**

In view of the judgment that the introduction into evidence of the confessions violated due process, it is unnecessary to decide the interesting question presented for the first time on oral argument, that the confessions, as the fruit of an unlawful arrest and detention, were rendered *per se* involuntary and inadmis-

sible.[13] Nor is it necessary to entertain Clayton's claim under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which, we note in passing, has not as yet been presented to the State courts and is therefore not properly before us. United States ex rel. Sloan v. McMann, 415 F.2d 275 (2d Cir. 1969); United States ex rel. Headly v. Mancusi, 415 F.2d 277 (2d Cir. 1969), cert. denied, 399 U.S. 932, 90 S.Ct. 2265, 26 L.Ed.2d 802 (1970).

Accordingly, Clayton's conviction must be overturned, and his petition for a writ of *habeas corpus* is hereby granted. He is therefore ordered released from custody unless he is retried or an appeal is taken from this order within thirty (30) days from the date of the entry hereof. This is an order.

---

13. While this question has been raised before, it has not been authoritatively answered by the Supreme Court. See Morales v. State of New York, 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969); Clewis v. Texas, *supra*; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Collins v. Beto, 348 F.2d 823 (5th Cir. 1965) [concurring opinion of Friendly, J.]. *Cf.* United States v. Edmons, 432 F.2d 577 (2d Cir. 1970).