**UNITED STATES of America ex rel. Pasquale DELLE ROSE, Petitioner,**

**v.**

**J. Edwin LaVALLEE, Superintendent of Clinton Correctional Facility, Respondent.**

**No. 71 Civ. 5111.**

United States District Court, S. D. New York.

May 16, 1972.

Allan Blumstein, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for respondent; Hillel Hoffman, Asst. Atty. Gen., of counsel.

## OPINION

FRANKEL, District Judge.

Mrs. Gloria Delle Rose was murdered shortly before 1:00 p. m. on March 9, 1963, by means of what a prosecution witness described, without hyperbole, as a "diabolical scheme." The petitioner, who was her husband, was found by a jury to have killed her, apparently because of raging jealousy over her supposed relationship with a former boyfriend. Sentenced to life imprisonment, he has now been confined for over nine years. He seeks the writ of habeas corpus on the ground that his confessions, comprising nearly all of the vital evidence against him, were not voluntary and rational, but were extracted in circumstances rendering unconstitutional their use in his trial. The ghastly facts of the crime, so far as they are now material, may be summarized as follows:

Petitioner had suffered a back injury in October 1962 which left him unable to work. He was scheduled on Saturday, March 9, 1963, to pick up his medical records from the office of a recently deceased physician who had been treating him and to deliver the records to another physician. On the morning of that day his wife, using their automobile, went to do some shopping, returning about 11:00 a. m. for their trip together for the medical records. With her driving, they went to the home of the late physician in City Island. They arrived back in their Bronx neighborhood somewhat over an hour later, planning to shop locally for some fabric she needed. She proceeded to park the car. Within a few minutes she was dead of gunshot wounds.

The foregoing chronology was not disputed. The heart of the grim controversy related to the question whether petitioner or someone else had rigged the device that caused Mrs. Delle Rose's death.

According to the prosecution's contentions, rested largely upon the confessions in issue, petitioner had purchased a shotgun with which to kill his wife when he became afflicted with jealousy. In the early morning hours of March 9, 1963, about 3:00 a. m. or so, he got out of bed and lodged the shotgun so that its muzzle pointed into the back of the driv-

er's seat. Using a wire hanger and a length of cord, he set the loaded weapon so that the triggers would be squeezed when the driver's seat was pulled forward from the position in which he left it. The plot rested upon his knowledge that his wife drove with the seat farther forward than he did.

On the morning of March 9, the confessions and the prosecution's story continued, after the couple had taken breakfast together, she left alone for her shopping trip. Petitioner opened a window and waited to hear the explosion signaling her death. But he was disappointed.

Then, to retrace the account given earlier, they went together to City Island and back to the Bronx. While Mrs. Delle Rose parked, petitioner reached behind her seat and accomplished what he had planned to happen automatically: he pulled the barrel forward, causing the weapon to fire and kill his wife.

Petitioner, who testified in his own defense, denied that he had set or known of the fatal mechanism. While his wife was parking, he claimed, he was turned sideways in the passenger seat, looking through the rear window to help guide her. He noticed a "brown paper bag" and "a mat that was along with it." He reached for this "lump," grabbed the mat to see what was under it, and then heard an explosion. He learned only afterwards the cause of the explosion and the fatal injuries to his wife.

With both the proof of his guilt and the assertion of innocence coming from petitioner's own mouth, the pretrial confessions were of undisputedly critical significance. There were two such accounts: one to police officers at the morgue, where petitioner had been taken to see his wife's body, at about 1:30 a. m.; the second taken by an assistant district attorney in question-and-answer form at about 6:00 a. m. Both were admitted over objections at the trial. Both are again questioned here.

The procedural setting, both in the state courts and this court, should be outlined to make clear the materials underlying the fact findings hereinafter recorded. While the circumstances attending the confessions were explored in the trial, there was no hearing or ruling in the jury's absence as required by the later decision in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Accordingly, when petitioner appealed his conviction, the parties stipulated that the trial court should hold a *Huntley* hearing, the familiar New York procedure named for People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965). For purposes of that hearing, the prosecution rested upon the trial record. Petitioner also relied upon the record, but took the witness stand to give supplementary testimony. The trial judge rendered a written decision. His opinion reviewed in separate installments the "trial testimony" and the "hearing testimony." As to the former, he said:

"So far as the trial record is concerned, I find that both these confessions are voluntary and were legally admissible in evidence."

He then summarized the trial testimony on both sides, including defendant's assertions (contradicted by the police officers) that he was, in the long hours before confessing, "asked to put his hand in the back seat where the blood of his wife was; that the police threatened to beat him up if he did not admit he killed her; that he was compelled to say by the police that he had killed his wife but that what he meant was that he had done so inadvertently, by placing his hand over the lump; and that, after telling the officer he wanted to see his wife, he did not remember what happened thereafter until 9:00 o'clock in the morning." Similarly, the judge recited the trial testimony of a psychiatrist opining that when petitioner confessed he was so exhausted "he would say yes if you asked him if the moon were made of green cheese."

Although he included these sworn assertions at trial by petitioner and the physician, the trial judge did not state

whether or to what extent he rejected any of them.

The opinion followed a similar course with respect to petitioner's *Huntley* hearing testimony. Again, there was a summary, this time in numbered and lettered paragraphs. Again, there was no statement as to how far, if at all, petitioner's account of the underlying historical facts was credited. Once more, taking all the evidence together, the judge recorded his conclusion that the confessions "were, in all respects, voluntary and legally admissible in evidence * * *."

With the record thus finally closed, petitioner pursued his appeals. The Appellate Division (33 A.D.2d 657) and the Court of Appeals (27 N.Y.2d 882, 317 N.Y.S.2d 358, 265 N.E.2d 770) affirmed without opinion, in 1969 and late 1970, respectively. Certiorari was denied on April 19, 1971, 403 U.S. 913, 91 S.Ct. 1395, 28 L.Ed.2d 656. At the end of 1971, the present application was brought.

■ Following preliminary consideration of petitioner's *pro se* papers and the State's responses, this court concluded that the state court decision on voluntariness did not rest upon the kind of "adequate" findings that could preclude (or, perhaps, from the stance of this busy trial court, the word is "obviate") an evidentiary hearing in this proceeding. See 28 U.S.C. § 2254(d) (3). The governing principles are familiar now. As was declared in Townsend v. Sain, 372 U.S. 293, 315–316, 83 S.Ct. 745, 758, 9 L.Ed.2d 770 (1963):

" * * * Unless the district judge can be reasonably certain that the state trier would have granted relief if he had believed petitioner's allegations, he cannot be sure that the state trier in denying relief disbelieved these allegations. If any combination of the facts alleged would prove a violation of constitutional rights and the issue of law on those facts presents a difficult or novel problem for decision, any hypothesis as to the relevant factual determinations of the state trier involves the purest speculation. The federal court cannot exclude the possibility that the trial judge believed facts which showed a deprivation of constitutional rights and yet (erroneously) concluded that relief should be denied. Under these circumstances it is impossible for the federal court to reconstruct the facts, and a hearing must be held."

See also Cooper v. Picard, 428 F.2d 1351, 1353–1354 (1st Cir. 1970); Stotts v. Perini, 427 F.2d 1296, 1297–1299 (6th Cir. 1970); Outing v. State of North Carolina, 344 F.2d 105, 106–107 (4th Cir. 1965). This court cannot be "reasonably certain" what facts of possibly coercive or stressful impact the trial judge found from the disputed testimony. The question of constitutional law, though it is easily stated, is surely a "difficult" one, calling for an informed synthesis of the "totality of the circumstances," Clewis v. Texas, 386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). As will appear, in this court's ultimate view, it is necessary, even if only some of petitioner's factual assertions are accepted, to grant the relief he seeks.

Having determined that there must be an evidentiary hearing, this court assigned counsel for petitioner. Three witnesses were heard—the petitioner and the two detectives to whom he had confessed. It was agreed, reserving as to questions of relevancy and materiality, that this court, like the state court, could range through the entire state record in addition to assessing the further record made here. Now, having studied the several chapters of record and the able briefs, the court announces the following findings and conclusions upon which the writ petitioner seeks will be granted.

Born in Italy 27 years before the murder of his wife, petitioner had a fourth-grade education in his native land. He was a dull student and was forced to quit school when he was 13 or 14. After some years of farm work, he came to the United States with his father in 1956. Seven years later, at the time of

the crime, he could not read or write English, and he spoke and understood it poorly—"just enough to get by."

Shortly after his immigration, petitioner obtained a job as a lamp caster at which he worked until an accident in October 1962 resulting in a severe back injury. As has been noted, he was still in treatment for this disabling injury in the following March, suffering stiffness and pain which are among the factors, though not critical in themselves, underlying the decision announced herein.

Antedating his back injury, petitioner had a history of seizures of some sort. The episodes would begin with neck and stomach pains becoming increasingly severe, culminating in seemingly convulsive states. He also suffered occasional lapses of memory, leaving blanks covering periods of a few hours or so. He claims to have suffered such a lapse a few days before March 9, 1963, and at a more critical time in the early hours of March 10. This court gives only limited credence, but some weight, to this assertion.

In November 1961, petitioner married the young woman who was to be the victim scarcely more than a year later. He had no criminal record then or at any time before her death.

Beginning immediately after the death of his wife, petitioner was in a state of severe distress, tension and anguish. It makes no difference, of course, for our purposes whether his condition reflected, *inter alia*, his guilt or only innocent horror. It is sufficient that, from his own and other testimony in the record, petitioner has proved that he was in a state of severe agitation. In the words of a disinterested bystander, he was "walking and hollering [and] crying" for some time after the explosion. He wept intermittently thereafter into the night and the following morning when his confessions were taken. He was dazed and bewildered much of the time. The nightmarish quality of the situation deepened as the afternoon passed. From about 1:00 to 4:00 p. m., petitioner was alternately seated on a nearby stoop, placed in a police patrol car, and allowed to talk with relatives who had come to the scene. He was questioned by a series of uniformed and plainclothes officers who came and went as the official investigation proceeded, and was eventually told, in response to his queries, that his wife was dead. During these three hours he was called upon to repeat several times his account of what had happened. Among other things, he told the police about threats he had received shortly before his marriage, warning him not to marry his fiancée. He stated that he had reported these warnings and his being a kidnap victim about three months prior to his wedding.

At about 4:00 p. m. petitioner was taken by the police to a Bronx station house, where he was to remain until a fateful trip to the morgue after 1:00 a. m. (and a confession there) followed by a return and further confession at 6:00 a. m. For most of the hours until midnight he was moved about from room to room of the police station and questioned by an array of officers, sometimes singly, sometimes in groups of two to three or five. For a while he was told to wait alone in the squad room. Then he was permitted to sit for 15 or 20 minutes with his mother, sister and brother, who lingered at the station until 9:00 or 10:00 p. m. Between 4:30 and 5:00 p. m. two detectives took him to a small room where varying numbers of detectives questioned him for an hour or an hour and a half. From there he was taken back to the squad room and questioned for another hour, mainly by the chief inspector but by others as well. Throughout these sessions, petitioner was asked to repeat his story over and over again, and he did so. The questioning by relays of officers continued, with brief interruptions, to the dramatic and sharply coercive reenactment hereinafter described.

Petitioner was not at any time through the night and the following morning told that he had a right to be silent, that his answers could be used

against him, or that he had a right to counsel.

At 9:00 p. m. or so, an assistant district attorney, who was later to take the second confession, introduced himself and spoke briefly to petitioner. He noted petitioner's stiff gait and asked about it. Petitioner told him of his back injury and of his pending legal claim relating to it. He mentioned the name of his lawyer and expressed a wish that his lawyer were with him at this moment. The assistant told petitioner he knew the latter's attorney and thought him able.[1] The assistant was later to deny hearing the petitioner (in his broken English) state a desire to have the lawyer with him. There is no need to reject this denial. What is plain is that this prosecutor was not listening intently for such an expression, either at this point or nearly twelve hours later when he led petitioner through a second confession. This court finds that petitioner made sufficiently clear so that government counsel should have understood his wish for the assistance of counsel.

Petitioner was, almost from the arrival of the police at the scene of the killing, a prime suspect. The location and rigging of the weapon in the car, to which only he and his wife had keys, the knowledge of the homicide squad members that many murders are family affairs, and the immediately evident questions raised by his account all led promptly to this focus upon him. Accordingly, while he was not placed formally under arrest until much later, he was given to sense from his arrival at the station house that he was not free to leave. When he went to the bathroom, he was told to leave the door open. He was addressed, with regrettably common police etiquette and no request for leave, by an oddly abbreviated version of his first name ("Pat"), the arrogated familiarity serving in the circumstances as an expression of dominance and a show of force. By the time the assistant district attorney first encountered

him, petitioner was being pressured, with sternness and displays of knowing skepticism, to "tell the truth" and abandon a story the officers treated as already demolished. He was being asked by 9:00 p. m. not merely "whether" but "how" he had rigged the murder weapon. He was being worn down by increasingly impatient and hostile rebuffs of his insistent and repeated denials.

At about 10 p. m. a television crew set up shop in the police station. Petitioner proceeded then to perform under the lights, telling his story once more for the 11 o'clock news. The chief inspector also made a statement for the television audience.

After continued questioning, with occasional interruptions, until midnight, three detectives took petitioner to the police garage to reenact the events immediately before his wife's death. Years later, at our hearing, he was to remember that a bright light was beamed at his eyes. The court does not credit this as recounted, but finds as an undisputed fact that the scene was well illuminated. Petitioner—suffering by now from acute back pains, headache, depleted blood sugar and depleted energy after long hours without food, and in an overall condition of wearied helplessness—proceeded to act out his story with detectives close beside him. When he had done, the questioners denounced his account as false and "impossible;" they argued to him with loud hostility that he could not possibly have seen the "lump" he described behind the driver's seat from where he sat turning in the passenger seat.

At this point, petitioner testified, one of the detectives threatened to beat him if he did not confess. This testimony appears to have been truthful though not necessarily accurate. The court does not find that there actually was such a threat. The court does find that the petitioner, pitted against the hostile and accusing trio in the garage, and scarcely fluent in English under the best of con-

---

1. The attorney in question appeared the next morning for petitioner at his arraignment.

ditions, understood that he faced a threat of violence. It takes little imagination to sense the quality of ominous and powerful antagonism in that midnight garage scene with petitioner arguing his fate against the angry incredulity of three police officers. Nevertheless, he held out for yet a while longer. The detectives continued to "balance" the tactic of threats with repetitions of the ostensibly solicitous suggestion, which had recurred throughout the evening, that petitioner would "feel better" if he told the truth.

At the end of the garage episode one of the detectives made the unusual offer to take petitioner to see his wife.[2] Petitioner accepted. Viewing his wife's body, he began to weep once more, kissed her cheek and said he was "sorry." Then he confessed.[3] He related that he had resolved to kill her; had bought the shotgun at Sears, sawed it off at City Island, and rigged it in the fashion heretofore described. Having given this account,

petitioner was brought back to the police station and questioned for a few more hours. A detective led him through the confession once again in much more detail, "making a thorough copy * * * of the entire conversation, and then shortly thereafter the Assistant District Attorney arrived and he took a statement.[4]

It appears that the assistant district attorney arrived back at the station at 3:00 a. m. or so and was briefed by the police for several hours before taking petitioner's statement. The verbatim transcript of that statement—admittedly with no warnings of any rights to an ignorant immigrant in petitioner's circumstances—is a vivid reminder of how at least some of the people's lawyers were accustomed to deal back in 1963 with uncounseled criminal adversaries.[5] The transcript begins:

"Question: My name is Norman Mordkofsky. I am an Assistant District Attorney. I am going to ask you

2. One of the detectives who took petitioner to the morgue (it being conceded by his partner that this was an extraordinary action) was asked on cross whether this was done in the hope "that there would be an emotional impact which would cause him to change his story * * *." He answered:

"No, I believe the reason that he did go to the morgue, I mean it was to, like say he was sorry to her, to tell her that he was sorry."

3. From this point until some seven hours later, at 9:00 a. m. or so, petitioner claims to have "blacked out." That is, he swears he has no memory of the events of that period. The court has experienced great difficulty in making a precise finding on this subject. The whole account of losses of memory is among the less convincing aspects of what has seemed generally persuasive testimony by petitioner. On the other hand, the court has not found satisfactory the course of rejecting entirely this item of evidence. In the end, the most nearly acceptable view is that petitioner's memory of those hours is at best dim—and sufficiently repulsive to him that repression is by no means a course of outright dishonesty. At any rate, the topic does not appear to be of decisive

importance. The narrative of events from here on follows the essentially consistent account given by prosecution witnesses.

4. The quotation is from the detective's testimony in this court (Tr. 176).

5. Compare the time-honored ethical inhibitions upon lawyers' dealings with adversary parties in the absence of counsel. And see United States v. Four Star, 428 F.2d 1406, 1407 (9th Cir.), cert. denied, 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970); Schantz v. Eyman, 418 F.2d 11, 13 (9th Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1259, 25 L.Ed.2d 530 (1970); Coughlan v. United States, 391 F.2d 371, 376 (9th Cir.) (Hamley, J. dissenting), cert. denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); Mathies v. United States, 126 U.S.App.D.C. 98, 374 F.2d 312, 316 (1967); Ricks v. United States, 118 U.S.App.D.C. 216, 334 F.2d 964, 970 (1964); Lee v. United States, 322 F.2d 770, 777 (5th Cir. 1963); United States ex rel. Vanderhorst v. LaVallee, 285 F.Supp. 233, 241 (S.D.N.Y.1968), aff'd, 417 F.2d 411 (2d Cir. 1969), cert. denied, McMann v. Vanderhorst, 397 U.S. 925, 90 S.Ct. 930, 25 L.Ed.2d 105 (1970).

a few questions and I would like truthful answers. Do you understand? Answer: Yes."

It goes on to extract from the petitioner a detailed case for the prosecution, culminating in "Yes, sir" answers to whether it has all been given voluntarily and after petitioner has been "treated properly."

It is pertinent that petitioner at this point had not slept and had eaten nothing for nearly 24 hours, since breakfast the day before. During the evening of March 9, his mother-in-law had given him half a container of coffee. He may have had coffee at another time during the night. He had been given water once or twice. He had been offered no food until long after midnight on March 9, and had felt neither free nor disposed to go get some for himself. On the return drive from his confession at the morgue, he was asked if he wanted a hamburger, and he declined. This testifies to the decency of the police. It does not suggest that petitioner was in good shape. Rather, it indicates a state of exhaustion, near breakdown, illness, extreme tension and resultant loss of appetite notwithstanding the need for food (to say nothing of rest) for effective functioning.

■ Upon the totality of the circumstances thus summarized, this court concludes that both confessions were unconstitutionally received in evidence against petitioner. Far from satisfying the State's burden of showing voluntariness by a preponderance, Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed. 2d 618 (1972), the evidence preponderates heavily the other way. It is not possible to conclude, as settled law requires, that petitioner confessed in the exercise "of a deliberate, sentient, and free choice, i. e., a rational intellect and a free will * * *." United States ex rel. Castro v. LaVallee, 282 F.Supp. 718, 723 (S.D.N.Y.1968) (Mansfield, J.), collecting the cases. Rather, we have a case of a man of little education and poor understanding of the language;[6] racked with physical pain and psychological distress;[7] weakened by hunger and lack of sleep;[8] questioned for long hours by teams of vigorous and increasingly hostile officers;[9] not told of his rights to silence, counsel, etc.,[10] but given by tone and manner to understand that each questioner "has a right to, and expects, an answer";[11] shoved before television

6. Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); United States ex rel. Castro v. LaVallee, 282 F.Supp. 718 (S.D.N.Y.1968).

7. Cf. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); United States ex rel. Williams v. Fay, 323 F.2d 65 (2d Cir. 1963), cert. denied, 376 U.S. 915, 84 S.Ct. 667, 11 L.Ed.2d 611 (1965).

8. Cf. Davis v. North Carolina, 384 U.S. 737, 746, 747, 86 S.Ct. 1761, 16 L.Ed. 2d 895 (1966); United States ex rel. Caminito v. Murphy, 222 F.2d 698, 701 (2d Cir.), cert. denied, 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955); United States ex rel. Clayton v. Mancusi, 326 F.Supp. 1366, 1371 (S.D.N.Y. 1971), aff'd, 454 F.2d 454 (2d Cir. 1972); United States ex rel. Castro v. LaVallee, supra.

9. Cf. Spano v. New York, supra, 360 U.S. at p. 322, 79 S.Ct. 1202; United States

ex rel. Burns v. LaVallee, 436 F.2d 1352 (2d Cir. 1970), cert. denied, 402 U.S. 1012, 91 S.Ct. 2190, 29 L.Ed.2d 436 (1971); United States ex rel. Weinstein v. Fay, 333 F.2d 815, 818 (2d Cir. 1964).

10. The trial antedated Miranda, but the failure to tell petitioner his rights remains a weighty factor against the State on the issue of voluntariness. Davis v. North Carolina, supra, 384 U.S. at 740, 86 S.Ct. 1761; Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (1966); Haynes v. Washington, 373 U.S. 503, 510–511, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); United States ex rel. Clayton v. Mancusi, supra, 326 F.Supp. at 1369–1370.

11. Culombe v. Connecticut, 367 U.S. 568, 575, 81 S.Ct. 1860, 1864, 6 L.Ed.2d 1037 (1961).

cameras after six hours or so of being moved about and assailed by his questioners in the police station; subjected to the coercion of a reenactment (including the forced placement of his hand into the seat back torn by the lethal pellets and wet with his late wife's blood) which he perceived with powerful reason as compulsory, hostile and ultimately damaging to his claims of innocence;[12] then, finally, overpowered by the macabre—if, fortunately, rare—stunt of a visit to the morgue, with pious explanations thereafter (see note 2, *supra*) that serve only to highlight the quality of relentless manipulation.[13] The denouement in the morgue, given its background, is far below the minimum process acceptable as due for the acquisition of evidence in a criminal case.

The later confession, at 6:00 a. m., is still worse, of course. Petitioner had been worn by further questioning, more hours of hunger, sleeplessness and stress. His compliant self-incrimination cannot be deemed to have been "voluntary" in any relevant sense. The lawyer for the State, with a court reporter, took a detailed confession from a helpless man. No lawyer in petitioner's condition would trust himself at the closing of a sale of a corner kiosk. It is not permissible for a trained, alert prosecutor to use the fruits of such a confrontation as evidence.[14]

It follows that the petition must be, and it is, granted. Petitioner will be released unless the State, within thirty (30) days, brings his case on for a new trial. It is so ordered.

The court records its appreciation for the able and devoted labors of Allan Blumstein, Esq., as petitioner's assigned counsel.

12. Cf. United States ex rel. Burns v. LaVallee, *supra*.

13. Cf. Spano v. New York, *supra*.

14. If the earlier confession at the morgue were held valid, the use of the later, fuller confession to the assistant district attorney would seem still to have been a fatal error in itself. Cf. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).